# NATIONAL RAILROAD PASSENGER CORPORATION ET AL. *v.* BOSTON & MAINE CORP. ET AL.

No. 90–1419.   Argued January 13, 1992—Decided March 25, 1992*

---

*Together with No. 90–1769, *Interstate Commerce Commission et al.* v. *Boston & Maine Corp. et al.*, also on certiorari to the same court.

408

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, and SOUTER, JJ., joined. WHITE, J., filed a dissenting opinion, in which BLACKMUN and THOMAS, JJ., joined, *post*, p. 424.

*Acting Solicitor General Roberts* argued the cause for petitioners in both cases. With him on the briefs for petitioners in No. 90–1769 were *Deputy Solicitor General Wallace, Michael R. Dreeben, Robert S. Burk, Henri F. Rush,* and *Charles A. Stark. Robert P. vom Eigen, Charles I. Appler, Theodore A. Howard, Richard F. Riley, Jr., Louis R. Cohen, Stephen C. Rogers,* and *Frederick C. Ohly* filed briefs for petitioners in No. 90–1419.

*Irwin Goldbloom* argued the cause for respondents in both cases and filed a brief for respondent Boston & Maine Corporation. *Jeffrey L. Amestoy,* Attorney General of Vermont, *John K. Dunleavy,* Assistant Attorney General, *Rex E. Lee, G. Paul Moates, Ronald S. Flagg, Robert J. Baum,* and *Michael F. McBride* filed a brief for respondents State of Vermont et al.†

JUSTICE KENNEDY delivered the opinion of the Court.

The Interstate Commerce Commission (ICC or Commission) issued an order, upon the request of petitioner National

---

†*Laurence Z. Shiekman, Paul A. Cunningham, Robert M. Jenkins III,* and *Bruce B. Wilson* filed a brief for Concerned Railroads as *amicus curiae* urging affirmance.

Railroad Passenger Corporation, requiring conveyance of 48.8 miles of railroad track from respondent Boston and Maine Corporation (B&M) to the Corporation. In these consolidated cases we must decide whether the ICC's decision was based on a reasonable interpretation and application of § 402(d) of the Rail Passenger Service Act, 45 U. S. C. § 562(d), the statute the Corporation invoked in the proceeding. We hold the ICC's decision is authorized by the statute, and so reverse the judgment of the Court of Appeals for the District of Columbia Circuit, which set aside the Commission's action.

I

The National Railroad Passenger Corporation, or Amtrak, is a private, for-profit corporation created by Congress in the Rail Passenger Service Act of 1970 (RPSA), Pub. L. 91–518, 84 Stat. 1328, 45 U. S. C. § 501 *et seq.* The purpose of Amtrak is to provide modern and efficient intercity and commuter rail passenger service. §§ 501, 541. Amtrak is not an agency or instrumentality of the United States Government, § 541, but it has been supported over the years by congressional appropriations. Most of Amtrak's passenger trains run over existing track systems owned and used by freight railroads. In the RPSA Congress authorized Amtrak to enter into "trackage rights" agreements which would allow Amtrak to use those tracks. When Amtrak and a freight railroad are unable to agree on the terms of such an agreement, Amtrak may request the ICC to order the track to be provided on reasonable terms. § 562(a).

In 1973 Congress amended the RPSA to add subsection (d) of § 402, 45 U. S. C. § 562(d). Section 562(d) provides in pertinent part:

"(1) If the Corporation [Amtrak] and a railroad are unable to agree upon terms for the sale to the Corporation of property (including interests in property) owned by the railroad and required for intercity rail passenger

service, the Corporation may apply to the Commission [ICC] for an order establishing the need of the Corporation for the property at issue and requiring the conveyance thereof from the railroad to the Corporation on reasonable terms and conditions, including just compensation. Unless the Commission finds that—

"(A) conveyance of the property to the Corporation would significantly impair the ability of the railroad to carry out its obligations as a common carrier; and

"(B) the obligations of the Corporation to provide modern, efficient, and economical rail passenger service can adequately be met by the acquisition of alternative property (including interests in property) which is available for sale on reasonable terms to the Corporation, or available to the Corporation by the exercise of its authority under section 545(d) of this title,

"the need of the Corporation for the property shall be deemed to be established and the Commission shall order the conveyance of the property to the Corporation on such reasonable terms and conditions as it may prescribe, including just compensation."

Amtrak may condemn nonrail property under a somewhat similar provision, § 545(d), a statute not at issue here.

The Amtrak train the "Montrealer" began offering passenger service between Washington, D. C., and Montreal in 1972. In parts of Massachusetts, Vermont, and New Hampshire the train used the tracks of the Connecticut River Line (Conn River Line), portions of which are owned by B&M and other portions by the Central Vermont Railroad (CV). B&M and CV have operated freight trains on the Conn River Line under reciprocal "trackage rights" agreements dating back to 1930.

In 1977 Amtrak entered into a "trackage rights" agreement with B&M under which B&M agreed to maintain its portions of the Conn River Line. Those portions include a 48.8-mile

segment of track on the Conn River Line between Brattle-
boro and Windsor, Vermont. This is the segment of track at
issue here. At first the arrangement to maintain the track
proceeded well, but in the early 1980's problems developed.
Guilford Transportation Industries, Inc., purchased B&M out
of bankruptcy, and purchased also a railroad operating a par-
allel line. Amtrak's claim is that neglect of track mainte-
nance resulting from this purchase caused delays in Mon-
trealer service. Maintenance of the Brattleboro-Windsor
track was so poor that at points the train was slowed to five
miles an hour. Negotiations for better maintenance were
unsuccessful. In April 1987 Amtrak was forced to discon-
tinue its Montrealer service.

Congress responded to these events in July 1987 by appro-
priating $5 million to upgrade the Montrealer route. Act of
July 11, 1987, Pub. L. 100–71, 101 Stat. 447–448. Amtrak
decided not to spend the money to upgrade the Conn River
Line while B&M continued to own it, because in Amtrak's
view B&M could not be relied upon to maintain the track
once restored. Amtrak began negotiations with CV and,
in early 1988, reached a preliminary agreement. Amtrak
promised to use its statutory condemnation power to acquire
the 48.8 miles of track in question, to at once reconvey the
track to CV, and to provide up to $3.1 million to upgrade
and rehabilitate the segment. In return, CV promised to
provide the balance of the funds necessary to upgrade the
track, to maintain the track for 20 years in a condition meet-
ing Amtrak's standards, to grant Amtrak trackage rights for
20 years, and to grant B&M trackage rights to serve its
existing customers. As a prerequisite to invoking § 562(d),
Amtrak made an offer to B&M to purchase the segment for
$1 million, on a take-it-or-leave-it basis. B&M offered to ne-
gotiate the terms under which it would be willing to upgrade
the segment and stated: "[I]t appears clear that there is no
need to pursue the very complex 'offer to purchase' set forth
in your letter." App. 60. B&M's refusal to accept the offer

seems to have been anticipated by Amtrak and CV, as indicated by an internal CV Memorandum written in January 1988. App. 94.

Interpreting the B&M communication as a rejection of its offer, Amtrak instituted this proceeding before the ICC to compel conveyance of the track. CV filed a simultaneous request for an exemption from ICC regulation for its acquisition of the segment upon reconveyance from Amtrak.

B&M assessed the transaction as a significant shift in its long competition with CV for freight traffic. CV already owned large parts of the Conn River Line and after the proposed transaction it would own most of it. Though B&M would have trackage rights, CV would gain not only ownership of the segment, but also the right to obtain new customers on its route. B&M alleged this gave a new advantage to CV's corporate parent, the Canadian National Railway Company, for each railroad links up with competing companies in Canada. CV's lines link to Canadian National, while B&M's lines link to the Canadian Pacific, Ltd., Canadian National's competitor. B&M challenged the transaction as simply a device to shift ownership among railroads, not to give ownership to Amtrak, which, B&M argued, was the sole purpose of the condemnation provision.

B&M filed initial objections to the §562(d) proceeding on two grounds: that Amtrak had not shown that the parties were unable to agree on reasonable terms of sale, and that §562(d) did not authorize condemnation of railroad lines. The ICC rejected B&M's arguments and in a condemnation proceeding held that Amtrak had shown the inability of the parties to agree to terms. It ruled that §562(d) covers railroad tracks because tracks are "rail property 'required for intercity rail passenger service.'" App. to Pet. for Cert. in No. 90–1419, pp. 130a–133a. B&M next sought to convert the proceeding into a trackage rights proceeding under §562(a), but the ICC again rejected B&M's position, holding that Amtrak had an "election of remedies" under §562 and

so had no obligation to seek trackage rights under subsection (a) before invoking subsection (d). *Id.*, at 115a–116a. Meanwhile, CV and the States of Vermont and Massachusetts, as well as numerous other parties, intervened in the ICC proceeding. (CV appears as a petitioner before this Court, and Vermont and Massachusetts support petitioners.)

This was the first decided case involving Amtrak's condemnation powers under § 562(d). *Id.*, at 39a. The ICC issued its final decision in 1988 and ordered conveyance of the segment with just compensation of $2,373,286. It reaffirmed earlier rulings and found that Amtrak "ha[d] met the statutory criteria for the institution of a proceeding" under § 562(d). *Id.*, at 40a–42a, 81a.

The ICC concluded that the presumption of Amtrak's need for the track contained in § 562(d)(1) was applicable. In its view both statutory criteria must be met to rebut the presumption, and B&M had established neither. As to alternative property (subsection (B)), the ICC found that no reasonable alternative route existed for the Montrealer service. And as to significant impairment of B&M's ability to carry out its common carrier obligations (subsection (A)), the ICC found that because B&M had been awarded just compensation and could continue to serve its customers under the "trackage rights" agreement which was part of the transaction, its ability had not been impaired. *Id.*, at 45a–46a. The bulk of the ICC's final decision deals with the question of just compensation, which is not before this Court. See *infra*, at 424.

On petition for review, a divided panel of the Court of Appeals for the District of Columbia Circuit granted the petition and remanded the matter to the ICC for further proceedings. 286 U. S. App. D. C. 1, 911 F. 2d 743 (1990). The majority held that § 562(d) does not permit Amtrak to condemn railroad property which it intends to reconvey to another railroad. It acknowledged that the ICC had inter-

preted § 562 in a different way, and that in the usual course judicial deference would be given to its interpretation under the principles enunciated in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984); but the court concluded that § 562(d) is unambiguous in light of its language and history, and so no deference was due. The panel majority reasoned that because Amtrak did not intend to retain the track to be condemned, it needed only its use, not its ownership. As Amtrak could obtain use of the property by obtaining either a "trackage rights" agreement under § 562(a), or by condemning an easement under § 562(d), the entire fee interest was not "'required for intercity rail passenger service.'" 286 U. S. App. D. C., at 8, 911 F. 2d, at 750. The majority stated that its holding was confirmed by other considerations, including: (1) the potential constitutional problems, under the Takings Clause, raised by the ICC's interpretation of § 562(d); (2) the structure of § 562, which indicated an intent on the part of Congress to relegate Amtrak to trackage rights under § 562(a) when seeking only the use of track; and (3) Congress' policy against cross-subsidization between sectors of the railroad industry, which the majority concluded would have been violated by this transaction. Judge Ruth B. Ginsburg concurred separately, rejecting the majority's interpretation of the statute, but concluding that a remand to the ICC was necessary because the ICC had not made adequate findings to determine whether Amtrak in fact needed to shift ownership of the segment from B&M to CV to protect its interests. *Id.*, at 11–13, 911 F. 2d, at 753–755. This factual question, whether Amtrak's portrayal of a recalcitrant B&M is accurate, remains in dispute. Under our resolution of the case, however, the issue need not be reached.

Amtrak and the ICC filed petitions for rehearing, and while the petitions were pending Congress amended § 562(d). The amendment, adopted in specific response to the Court of

Appeals' decision in this case, added the following sentence to § 562(d)(1): "The Corporation may subsequently convey title or other interest in such property to a third party, if such reconveyance is found by the Commission to further the purposes of this Act." Independent Safety Board Act Amendments of 1990 § 9(a), Pub. L. 101–641, 104 Stat. 4658. The amendment was made applicable to all pending cases, § 9(b), and B&M does not dispute that it applied in this case even while it was before the Court of Appeals on rehearing. Brief for Respondent B&M 33–35. The Court of Appeals considered the 1990 amendment, but denied rehearing nonetheless. 288 U. S. App. D. C. 196, 925 F. 2d 427 (1991). The panel majority held that while § 9 made it clear Amtrak was authorized to reconvey condemned property *"subsequent to a condemnation that is otherwise valid under [§ 562(d)],"* it did not change the statutory limitation that the property be " 'required for intercity rail passenger service' " in the first place. *Id.,* at 197, 925 F. 2d, at 428 (emphasis in original). The majority reasoned that since its original decision was based on Amtrak's failure to satisfy that requirement, the amendment did not affect its holding. The majority also distinguished a case from the Second Circuit, *National Railroad Passenger Corp.* v. *Two Parcels of Land,* 822 F. 2d 1261, cert. denied, 484 U. S. 954 (1987), which had interpreted § 545(d)(1) (the provision authorizing Amtrak to condemn nonrail property) to permit reconveyance following condemnation. 288 U. S. App. D. C., at 196–197, 425 F. 2d, at 427–428. In a separate opinion, Judge Ginsburg wrote that the amendment confirmed her view that the ICC had not misinterpreted the statute, but that a remand remained necessary for further factual determinations.

Amtrak and CV, in No. 90–1419, and the ICC, in No. 90–1769, filed separate petitions seeking review of the Court of Appeals' decision. We granted certiorari and consolidated the cases. 502 U. S. 807 (1991). We now reverse.

## II

The primary question raised by these cases is a straightforward matter of statutory interpretation: whether § 562(d), as amended, authorizes the condemnation and transaction approved by the ICC but set aside by the Court of Appeals. The Court of Appeals disallowed the transaction based on its own interpretation of the language "required for intercity rail passenger service" in § 562(d)(1). In so holding it limited Amtrak's condemnation authority to property that was necessary, in the sense of indispensable, to Amtrak's operations. The ICC interpreted the relevant statutory language to give Amtrak more latitude, and it is our task to determine whether the Commission had authority for its statutory interpretation.

Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law. We relied upon it in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), and have reaffirmed it often. See, *e. g.*, *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 292–293 (1988); *Pauley* v. *BethEnergy Mines, Inc.*, 501 U. S. 680, 696–697 (1991). These decisions mandate that when a court is reviewing an agency decision based on a statutory interpretation, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U. S. A., supra,* at 843. If the agency interpretation is not in conflict with the plain language of the statute, deference is due. *K mart Corp.*, 486 U. S., at 292. In ascertaining whether the agency's interpretation is a permissible construction of the language, a court must look to the structure and language of the statute as a whole. *Id.,* at 291; *Sullivan* v. *Everhart*, 494 U. S. 83, 89 (1990). If the text is ambiguous and so open to interpretation in some respects, a degree of deference is granted to the agency, though

a reviewing court need not accept an interpretation which is unreasonable.

Under these principles the ICC's interpretation of § 562(d) was permissible, and the Court of Appeals' decision was in error to disregard it. While the ICC's opinion is not explicit in all of its details, the Commission's decision is based on a reading of the statute quite different from the Court of Appeals'. The ICC agreed that property Amtrak seeks to condemn under § 562(d) must be "required for intercity rail passenger service." It determined, however, that the word "required" need not mean, as the Court of Appeals' opinion suggests, indispensable or necessary. Instead, the ICC gave effect to the statutory presumption of Amtrak's need for the track, and in so doing implemented and interpreted the statute in a manner that comports with its words and structure. The analysis of the Court of Appeals is inconsistent with the Commission's interpretation of the statutory presumption of need. The ICC's position before the Court is that "required" can also mean "useful or appropriate," Brief for Petitioners in No. 90–1769, p. 17, and that the order under review adopted that meaning. We agree that the manner in which the ICC has applied the statute in this case has that interpretation as its basic premise. App. to Pet. for Cert. in No. 90–1419, pp. 42a–46a.

In its brief the ICC cites a dictionary definition in support of its view. Brief for Petitioners in No. 90–1769, p. 17, citing Webster's Third New International Dictionary 1929 (1986). The existence of alternative dictionary definitions of the word "required," each making some sense under the statute, itself indicates that the statute is open to interpretation. See *Sullivan* v. *Everhart, supra.* Few phrases in a complex scheme of regulation are so clear as to be beyond the need for interpretation when applied in a real context. Further, the structure of the provision reinforces our conclusion that statutory interpretation is appropriate and that the Court of Appeals' interpretation is itself open to serious question.

The court defined the word "required" to establish a separate condition that the property sought to be condemned be necessary (indispensable) for Amtrak's operations, a view which is not without support. See, *e. g.,* American Heritage Dictionary of the English Language 1105 (2d ed. 1981). This interpretation, though, leaves little substance to the statutory presumption in favor of Amtrak's need and so is in clear tension with that part of the statute.

We decide that § 562(d) is ambiguous in some respects and conclude that the ICC's interpretation of the word "required" is a reasonable one. We defer to its interpretation. This is not to say that the issue is beyond dispute, but these alternative interpretations are as old as the jurisprudence of this Court. In *McCulloch* v. *Maryland,* 4 Wheat. 316, 413 (1819), Chief Justice Marshall, in a choice of interpretations with some parallels to this one, read the word "necessary" to mean "convenient, or useful," rejecting a stricter reading of the term which would have limited congressional power under the Constitution to the "most direct and simple" means available. We think that as a matter of definition and interpretation in the context of this statute it is plausible, if not preferable, to say that Amtrak can find that an acquisition is required when it is a useful and appropriate way to accomplish its goals.

The Commission's interpretation is consistent also with the 1990 statutory addition enacted by Congress. While the amendment does not modify the specific language of § 562(d) at issue here, it confirms the ICC's view. The interpretation given to § 562(d) by the Court of Appeals and B&M, on the other hand, would make the amendment superfluous, because if the word "required" has the strict meaning they seek to attribute to it, condemnations by Amtrak would seem to be barred whenever Amtrak's purpose is to reconvey the property.

Contrary to the position of the dissent, we are not "deferring to what we imagine an agency had in mind." *Post,* at

428. Rather, we defer to an interpretation which was a necessary presupposition of the ICC's decision. We recognize the well-established rule that an agency's action may not be upheld on grounds other than those relied on by the agency. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 88 (1943). But the fact that the ICC did not in so many words articulate its interpretation of the word "required" does not mean that we may not defer to that interpretation, since the only reasonable reading of the Commission's opinion, and the only plausible explanation of the issues that the Commission addressed after considering the factual submissions by all of the parties, is that the ICC's decision was based on the proffered interpretation. *Chenery* does not require a remand under those circumstances. It is noteworthy in this regard that neither party contends the ICC's decision was not informed and governed by this statutory interpretation. B&M's primary argument to the Court is that the word required must mean necessary. Brief for Respondent B&M 16, 22, 44. But this, as we have said, is quite inconsistent with the statutory presumption of need to which the ICC gave effect.

There is no dispute on this record that Amtrak intends to use the condemned track for its Montrealer service. Under the ICC's view that use is sufficient to satisfy the statutory command that the rail property be "required for intercity rail passenger service." This is a reasonable interpretation and application of the RPSA. And it ends the judicial inquiry on this point.

What we have said also answers Judge Ginsburg's concern that the ICC must make specific findings regarding Amtrak's actual need for the condemnation. The contention that such a finding was necessary, to implement the statutory criterion that the property be "required for intercity rail passenger service," was the basis for Judge Ginsburg's concurrence in the Court of Appeals. 286 U. S. App. D. C., at 12, 911 F. 2d, at 754. That position, however, appears to be based on the same interpretation of the word "required" as that adopted

by the Court of Appeals' majority, and so is inconsistent with the ICC's interpretation. The ICC contends that the factual finding is not mandated. It argues that the structure of the statute, combined with the presumption created by the statute of Amtrak's need for the property sought, creates a strong inference that the statute authorizes Amtrak to make a reasonable business judgment that condemnation of the property is advisable. We agree. The ICC's oversight responsibility, exercised by enforcing the "required for intercity rail passenger service" language as interpreted by the Commission, is limited to ensuring that the condemned property will be used in Amtrak's rail operations. The further determination of need is delegated to Amtrak, unless the statutory presumption is rebutted; and it is not rebutted here. Indeed, as our discussion above indicates, *supra*, at 418–419, it seems to us that any other interpretation may be inconsistent with the statutory presumption of need. In all events, the ICC's interpretation is a reasonable one, and we may not substitute a different view.

Arguing against the ICC's interpretation, B&M cites to us cases such as *United States* v. *Carmack*, 329 U. S. 230, 243, n. 13 (1946), which suggest that delegations of eminent domain power to private entities are of a limited nature. We do not believe that argument has any relevance here because Amtrak does not exercise eminent domain power under § 562(d). Rather, the statute gives that power to the ICC, a Government agency. To be sure, the statute creates a presumption in favor of conveyance to Amtrak. But the ICC must assess the impact of any condemnation and make a determination as to just compensation. Since § 562(d) is a proper exercise of regulatory authority, and the ICC's oversight of Amtrak is intended to ensure compliance with the statute, the eminent domain power here is not private.

Furthermore, this case turns on the need for deference to the ICC, not Amtrak. There is nothing in the cases B&M cites contradicting the rule of judicial deference to an

agency's statutory interpretation, even when the statute is one authorizing condemnation of private property. In short, the principle advanced by B&M does not prevail over *Chevron*'s rule of deference.

We also reject B&M's constitutional objections. B&M claims that § 562(d) as interpreted by the Commission violates the "public use" requirement of the Fifth Amendment's Takings Clause, because the transaction leaves unchanged the use made by Amtrak of the condemned track. B&M's position cannot be reconciled with our precedents. We have held that the public use requirement of the Takings Clause is coterminous with the regulatory power, and that the Court will not strike down a condemnation on the basis that it lacks a public use so long as the taking "is rationally related to a conceivable public purpose." *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 240–241 (1984); see also *Berman* v. *Parker,* 348 U. S. 26, 32–34 (1954). In *Midkiff* we upheld land reform legislation which authorized condemnations for the specific purpose of transferring ownership to another private party, in order to eliminate a land oligopoly. In *Berman* we permitted land condemnations which contemplated reselling the land to redevelopers, as part of a plan to restore dilapidated sections of the District of Columbia. In both *Midkiff* and *Berman,* as in the present case, condemnation resulted in the transfer of ownership from one private party to another, with the basic use of the property by the government remaining unchanged. The Court held these exercises of the condemnation power to be constitutional, as long as the condemning authorities were rational in their positions that some public purpose was served. Those holdings control here, for there can be no serious argument that the ICC was irrational in determining that the condemnation will serve a public purpose by facilitating Amtrak's rail service. That suffices to satisfy the Constitution, and we need not make a specific factual determination whether the con-

demnation will accomplish its objectives. *Midkiff, supra,* at 242–243.

As a last effort, B&M argues that this matter must be remanded to the ICC because the Commission did not make adequate and accurate findings regarding several different matters. B&M claims that Amtrak failed to prove the parties were "'unable' to agree" on terms of sale. In B&M's view, § 562(d) demands that Amtrak engage in "good faith . . . negotiations" before it may invoke its condemnation powers. Brief for Respondent B&M 42. The ICC construed the language of § 562(d) in a more narrow fashion, to mandate nothing more than a factual determination that the parties will not be able to reach agreement through further negotiations. App. to Pet. for Cert. in No. 90–1419, pp. 130a–131a ("Nothing in this record provides any indication that Amtrak and B&M will ever reach agreement on terms of sale"). This is a reasonable interpretation of the phrase "unable to agree upon terms for the sale," and we do not substitute a different view. Thus the Commission did not err in concluding that this statutory prerequisite was satisfied.

B&M argues further that the ICC made inadequate factual findings in concluding: (1) that this conveyance will not significantly impair B&M's ability to carry out its obligations as a common carrier, § 562(d)(1)(A); and (2) that Amtrak's obligations cannot be met by the acquisition of alternative property, § 562(d)(1)(B). As to significant impairment, B&M's argument, like the decision of the Court of Appeals on this point, 286 U. S. App. D. C., at 8–9, 911 F. 2d, at 750–751, relies on the notion that in assessing impairment the ICC may consider only the conveyance itself, not any mitigating measures adopted in response to the conveyance, such as the grant of trackage rights to B&M. We find no basis in the text or structure of § 562(d) for this position and cannot say that the statute must be interpreted to mandate such a restrictive inquiry. The ICC was not unreasonable in considering the effect of the "trackage rights" agreements and the just com-

pensation award in assessing significant impairment; and the ICC's conclusion, that B&M's ability to carry out its common carrier obligations will not be impaired by the transaction in any significant way, is supported by substantial evidence. As to the availability of alternative property, the ICC interpreted that provision as referring only to whether Amtrak could provide service using an alternative route, not whether a lesser interest in property would suffice to meet Amtrak's needs. Again, this was a reasonable reading to which we defer. Since B&M would have to prevail on both the significant impairment and alternative property issues to rebut Amtrak's presumption of need, there can be no doubt that the ICC's finding that Amtrak established its need for the property must be affirmed.

## III

For the reasons we have stated, we hold that the ICC did not exceed its authority in ordering conveyance of the 48.8-mile segment of the Conn River Line from B&M to Amtrak. Because of its contrary holding on this point, the Court of Appeals did not address the parties' challenges to the ICC's just compensation finding as well as certain other issues. *Id.*, at 11, 911 F. 2d, at 753. These questions should be resolved on remand. The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE THOMAS join, dissenting.

The majority opinion proceeds from the well-established principle that courts should defer to permissible agency interpretations of ambiguous legislation.[1] *Chevron U. S. A.*

---

[1] I agree with the majority that the Court of Appeals erred in concluding that § 402(d) of the Rail Passenger Service Act (RPSA), 45 U. S. C. § 562(d), unambiguously prohibits transactions such as the sale and leaseback ar-

*Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 843 (1984); *Pauley* v. *BethEnergy Mines, Inc.,* 501 U. S. 680, 696–697 (1991). I have no quarrel with that general proposition. I do, however, object to its invocation to justify the majority's deference, not to an agency interpretation of a statute, but to the *post hoc* rationalization of Government lawyers attempting to explain a gap in the reasoning and factfinding of the Interstate Commerce Commission (ICC or Commission). *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 50 (1983).

Section 402(d) of the RPSA, codified at 45 U. S. C. § 562(d), provides that Amtrak may apply to the ICC for an order directing the conveyance of another railroad's property *if* Amtrak can meet two conditions: Amtrak and the other railroad must be unable to agree upon terms for sale of the property, and the property must be "required for intercity rail passenger service." If these conditions are met, "the need of [Amtrak] for the property shall be deemed to be established," and the other railroad will be able to retain its property only if it can rebut the strong presumption of Amtrak's need. *Ibid.*

Because conferring upon Amtrak the presumption of need will determine the outcome of most disputes under this section, the two conditions that Amtrak must establish to receive the benefit of the presumption assume particular importance. However, in the present case, the ICC failed to address one of these factors. Although the Commission determined that the parties had been unable to come to terms for sale of the disputed property, see App. to Pet. for Cert. in No. 90–1419, pp. 130a–131a, it neither interpreted nor applied the second condition, that the property be "required

rangement between Amtrak and the Central Vermont Railroad. Legislation passed while this case was pending before the Court of Appeals makes it clear that such transactions are permissible. Independent Safety Board Act Amendments of 1990 § 9(a), Pub. L. 101–641, 104 Stat. 4658.

for intercity rail passenger service." Instead, after rejecting respondent Boston & Maine Corporation's argument that Amtrak could restore Montrealer service by obtaining trackage rights or an easement, the ICC simply concluded that "Amtrak has demonstrated sufficient reason to justify acquisition of ownership of the line." *Id.*, at 43a.

The majority acknowledges that "the ICC's opinion is not explicit in all of its details," see *ante*, at 418, but nevertheless concludes that the Commission's reading of the statute is entitled to deference because it "gave effect to the statutory presumption of Amtrak's need for the track, and in so doing implemented and interpreted the statute in a manner that comports with its words and structure." *Ibid.* But this begs the question of what showing Amtrak must make to establish that the track is "required" so that Amtrak may therefore obtain the benefit of the presumption of need.

The simple fact is that *the ICC never addressed this point*, and therefore failed to construe a key portion of the statute. The omission is particularly significant because this is the first action treating Amtrak's condemnation powers under § 402(d) of the Act; it will guide future adjudications.

Rather than acknowledging the ICC's omission and remanding for clarification and factfinding, the majority relies on the Government's argument that the Commission must have interpreted the word "required" as meaning "useful or appropriate." *Ibid.* But this interpretation was not developed by the ICC during its administrative proceedings. Indeed, the explanation was not even proposed in the Commission's argument to the Court of Appeals.[2] This ICC

---

[2] This is how the Commission framed its argument to the Court of Appeals:

"Under *Chevron [U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984)], the Commission had broad discretion to interpret RPSA in this proceeding. This is certainly true with regard to the central issu[e] of determining . . . what must be shown to justify a taking under section 402(d) . . . . As to [this] issue, the statute merely states that Amtrak's need for the property will be presumed unless the transfer will significantly impair the ability of the carrier to carry out its common

definition of "required" debuted in the Commission's briefs before this Court. It is nothing more than a creation of appellate counsel, concocted to fill the gaps in the Commission's analysis. "The short—and sufficient—answer to [this] submission is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action. . . . It is well established that an agency's action must be upheld, if at all, on the basis *articulated* by the agency itself." *Motor Vehicle Mfrs. Assn., supra,* at 50 (emphasis added), citing *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 168 (1962); *SEC* v. *Chenery Corp.,* 332 U. S. 194, 196–197 (1947); *American Textile Mfrs. Institute, Inc.* v. *Donovan,* 452 U. S. 490, 539 (1981). Therefore, the majority is simply wrong in asserting that, even though "the ICC did not in so many words *articulate* its interpretation of the word 'required,'" the Court may nevertheless defer to the Commission's decision. See *ante,* at 420 (emphasis added).

Because of the gap in the ICC's interpretation of the statute, "[t]here are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion." *Burlington Truck Lines, Inc., supra,* at 167. The majority concludes, again based on the agency's presumed interpretation of the statute, that the Commission was not obligated to make specific findings as to whether the property was "'required for intercity rail passenger service.'" See *ante,* at 420. This magnifies the ICC's mistake; an administrative "agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc.,* 371 U. S., at 168.

Deferring to a federal agency's construction of the legislation that it is charged with administering is one thing. But deferring to inferences derived from reading between the lines of an agency decision or excerpted from the brief of

---

carrier obligations *and* Amtrak's needs can be met with alternative property." Joint Brief for Respondents in No. 88–1631 (CADC), pp. 15–16.

a Government lawyer is another matter entirely. "For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review." *Id.*, at 169. Because the ICC has failed to provide a clear, authoritative construction of "required for intercity rail passenger service," we should return this case to the Commission so that the agency can do its job properly. But we should not strain the *Chevron* principle by deferring to what we imagine an agency had in mind when it applied a statute. Therefore, I respectfully dissent.