**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-50512

_____


UNITED SERVICES AUTOMOBILE ASSOCIATION,

Plaintiff-Appellee,

VERSUS

WILLIAM J. PERRY,
Secretary of United States Department of Defense,
and
UNITED STATES OF AMERICA,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas

_____


December 13, 1996


Before SMITH, DUHÉ, and DeMOSS, Circuit Judges.

PER CURIAM:


The opinion originally issued in this case, 92 F.3d 295 (5th Cir. 1996) (per curiam), is hereby withdrawn, and the following opinion is substituted for purposes of clarification:


In this case of first impression, we are called upon to interpret the meaning of Congress's 1990 amendment to 10 U.S.C.

§ 1095 (Supp. 1995), which allows the military to be reimbursed by insurance carriers for medical expenses it incurs in treating soldiers whom the carriers insure. We determine that the term "no-fault insurance carrier," as it appears in the statute, is ambiguous. We therefore defer to the interpretation of that term by the agency entitled to administer the statute, the Department of Defense ("DOD"), reverse the summary judgment in favor of United Services Automobile Association ("USAA"), and render summary judgment for the government.[1]

## I.

This case arises from twelve separate automobile accidents[2] involving members of the military who were entitled to receive and did receive medical care in a military hospital and who were also insured by USAA. The service members were treated for their injuries at military hospitals at no cost to the soldiers. 10 U.S.C. §§ 1074, 1076 (Supp. 1995). Each soldier had an individually-owned automobile insurance policy issued by USAA that contained liability coverage, uninsured motorist coverage, coverage for damage to the insured's vehicle and medical payments coverage

---

[1] The defendants-appellants in this action are William J. Perry, Secretary of Defense, and the United States of America. Both parties will collectively be referred to as the "government."

[2] It would appear that all of these accidents occurred in states which have retained tort theories as the basis for recovery for injuries in automobile accidents and have not adopted a comprehensive scheme of "no-fault insurance" for dealing with injuries arising out of automobile accidents. It would also appear that these accidents occurred after 1990.

("Medpay"), which covered the insureds for medical costs arising from automobile accidents.

The government filed claims with USAA, seeking reimbursement for costs incurred in treating USAA's insureds. The government based its claim on 10 U.S.C. § 1095(a)(1), which provides that "the United States shall have the right to collect from a third-party payer the reasonable costs of health care services incurred by the United States on behalf of such person through a [military hospital]. . . ." The statute defines a "third-party payer" as "an entity that provides an insurance, medical service, or health plan by contract or agreement, including an automobile liability insurance or no-fault insurance carrier." § 1095(h)(1).

USAA refused to pay, and instead filed a declaratory judgment action against the government, seeking a determination that it did not owe reimbursement. Specifically, USAA sought a determination that it was not a third-party payer under § 1095.

The parties stipulated that there were no disputed facts and filed cross-motions for summary judgment. The district court ruled in USAA's favor, holding that Medpay is not no-fault insurance and USAA is therefore not a third-party payer liable to the government under § 1095. The government timely appealed.

II.

The government contends that USAA is a "third-party payer"

3

under § 1095, required to reimburse the government for health care the military provides its insureds. We must determine whether USAA is a "third-party payer" because of the inclusion of its Medpay coverage in its automobile policy.

Before 1990, § 1095 defined "third-party payer" as "an entity that provides insurance, medical service or health plan by contract or agreement." Congress amended the statute in 1990, adding the words "including an automobile liability insurance or no-fault insurance carrier." The government and USAA have already litigated the issue of whether USAA is a third-party payer because of Medpay under § 1095 as it was prior to 1990. In *United States v. USAA*, 5 F.3d 204 (7th Cir. 1993), the court held that USAA was not such a third-party payer.

We are, of course, not bound by the Seventh Circuit's decision. Principles of estoppel, however, preclude the government from re-litigating against the same party an issue upon which another circuit has ruled against the government. *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 171 (1984). Thus, if the government is to prevail in its view that USAA is now a third-party payer, it must do so under the 1990 amendments.[3] We must, therefore, determine whether USAA is an "automobile liability insurance or no-fault insurance carrier."

---

[3] We take no position as to whether the prior case against USAA was decided correctly. We merely conclude that, because the parties and the issues are the same, the government is precluded from arguing that USAA was a "third-party payer" under the pre-1990 version of the statute.

4

We conclude that USAA is a no-fault insurance carrier because Medpay is a form of no-fault insurance. DOD is entrusted to administer § 1095, and it has issued regulations interpreting the term "no-fault insurance" as

> an insurance contract providing compensation for health and medical expenses relating to personal injury arising from the operation of a motor vehicle in which the compensation is not premised on who may have been responsible for causing such injury. No-fault insurance includes personal injury protection and medical payments benefits in cases involving personal injuries resulting from operation of a motor vehicle.

32 C.F.R. § 220.12(I) (1995). USAA urges us to reject this definition, arguing that "no-fault insurance" refers only to a state-adopted regime of automobile insurance that pays without regard to fault.

When an agency has issued an interpretation of a statute it is entitled to administer, our own interpretation of the statute is not entirely *de novo*. The Supreme Court has given us guidance, in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), in reviewing such agency regulations:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the

5

question for the court is whether the agency's answer is based on a permissible construction of the statute. [Footnotes omitted.]

Accordingly, our first task is to apply the "traditional tools of statutory construction," *id*. at 843 n.9, and determine whether the statute is ambiguous.  If we decide that Congress has spoken directly to the precise issue, our job is done; we will "give effect to the unambiguously expressed intent of Congress."  *Id*. at 843.  If, however, we find that Congress has not spoken plainly to the issue and the statute is ambiguous, we then will determine whether the agency's construction of the statute is a permissible one.

A statute is ambiguous if it is susceptible of more than one accepted meaning.  *See MCI Telecommunications Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, ___, 114 S. Ct. 2223, 2230 (1994); *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418-19 (1992); *see also* NORMAN J. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION § 45.02 (5th ed. 1992).  In interpreting a statute, we begin with its plain language.  White v. INS, 75 F.3d 213, 215 (5th Cir. 1996); *Phillips v. Marine Concrete Structures, Inc.*, 895 F.2d 1033, 1035 (5th Cir. 1990).  Our attempt to ascertain plain meaning requires us to look not only to "the particular statutory language at issue," but also to "the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citing *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 403-05 (1988);

6

*Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220-21 (1986)).  It is only when traditional methods of statutory construction fail to reveal a provision's meaning that we conclude that it is ambiguous.  *Chevron*, 467 U.S. at 843 & n.9.

At first glance, either USAA's or the government's interpretation of § 1095 seems plausible.  Recourse to dictionaries does not clarify the issue but only serves to prove that the term "no-fault insurance carrier" is ambiguous.  One authority defines no-fault as "[o]f or indicating a system of automotive insurance in which accident victims are compensated by their insurance companies without assignment of blame."  WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 797 (1988).  This definition supports USAA's position, as it considers "no-fault" as referring to a system of insurance.  Another source supports the government's view by defining "no-fault" as "of, or relating to, or being a motor vehicle insurance plan under which an accident victim is compensated . . . by his own insurance company regardless of who is responsible for the accident."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 801 (1989).

Both parties can (and do) claim assistance from a third reference, which defines "no-fault auto insurance" as the

> [t]ype of automobile insurance in which claims for personal injury . . . are made against the claimant's own insurance company (no matter who was at fault) rather than against the insurer of the party at fault.  Under such state 'no-fault' statutes only in cases of serious personal injuries and high medical costs may the injured bring an action against the other party or his insurer. No-fault statutes vary from state to state in terms of

7

scope of coverage, threshold amounts, etc.

BLACK'S LAW DICTIONARY 723 (5th ed. 1979). Still another authority defines "no-fault" as "designat[ing] a form of motor vehicle insurance." OXFORD ENGLISH DICTIONARY 462 (2d ed. 1989). In its examples of usage, however, it leans toward USAA's definition. *Id*. at 462 ("[A] no-fault compensation system in being discussed . . . . [a] strong no-fault insurance bill."). A final source lends credence to the government's position, defining "no-fault" as "a form of automobile insurance enabling the policyholder in case of an accident to collect a certain basic compensation . . . from his own insurance company without determination of liability." RANDOM HOUSE COLLEGE DICTIONARY 902 (1982).

Based on this review of definitions of "no-fault," we determine that the word is commonly used in both ways, to denote either (1) an insurance policy or (2) a state-imposed insurance system that pays regardless of fault. Thus, the "battle of the dictionaries" does not resolve the ambiguity.

Because "no-fault" is an insurance term and can be a term of art, we also consider how the word is used in the insurance field. A leading insurance treatise uses "no-fault" to refer to a state system of insurance without regard to fault. 12A COUCH ON INSURANCE §§ 45:661-678 (2d ed. 1981); *see also* R. LONG, THE LAW OF LIABILITY INSURANCE § 27.01 at 27-3 (1994). Another treatise, however, refers to insurance policies paying without regard to fault as "nonfault

8

insurance."  ROBERT E. KEETON, BASIC TEXT OF INSURANCE LAW, § 4.10 at 246 (1971).   Therefore, we can see that while "no-fault" is more commonly used in the insurance area to mean a state system paying regardless of fault, it can also be used to refer to a policy that pays regardless of fault.

This analysis leads us to conclude that, as used in § 1095, the term "no-fault insurance" is susceptible of two distinct meanings.  Moreover, a review of the design of the statute as a whole, as well as of its relationship with other laws, does not clarify its meaning.  Therefore, the statute is ambiguous.[4]  *Cf. MCI Telecommunications*, 512 U.S. at ___, 114 S. Ct. at 2230 ("Most cases of verbal ambiguity in statutes involve . . . a selection between accepted alternative meanings shown as such by many dictionaries.").  As Congress has not "directly addressed the precise question at issue" here, it remains for us to determine

---

[4] The dissent concludes that the statute's legislative history renders the term "no-fault insurance" unambiguous, although it concedes that the text of the statute is ambiguous.  It is a rare case indeed in which legislative history alone will permit us to find that "Congress has . . . directly addressed the precise question at issue." *Chevron*, 467 U.S. at 843.  This is not such a case.  The dissent acknowledges that the committee reports of the House and Senate merely restate the text of the amendment. *See* H. REP. No. 923, 101st Cong., 2d Sess., reprinted at 1990 U.S.C.C.A.N. 3110; H. REP. No. 665, 101st Cong., 2d Sess., reprinted at 1990 U.S.C.C.A.N. 2931; S. REP. No. 521, 101st Cong., 2d Sess.

The "legislative history" relied upon by the dissent is not really legislative history at all, but a general background history of the statute drawn from non-legislative sources.  This is an even less reliable basis than legislative history from which to conclude that a statute, ambiguous on its face, is unambiguous in fact.  Indeed, we conclude from the general background history of § 1095 that the purpose of the statute is to prevent a windfall to insurers who happen to be liable to members of the armed forces, and that purpose is furthered by DOD's interpretation of the statute.  In any event, we respectfully do not believe that the dissent's sources are adequate to allow us to find that "Congress has directly addressed the precise question at issue."

whether DOD's construction of that term is a permissible one. *Chevron*, 467 U.S. at 843. We have no difficulty concluding that it is. DOD's construction is consistent with the language of the statute, dictionaries, and insurance treatises. It is not, of course, the only permissible construction, but it is one permissible construction, and that is enough. We are *Chevron*-bound to conclude that Medpay is a form of no-fault insurance within the meaning of § 1095, and USAA is liable to the government for reimbursement of medical expenses.

The judgment is REVERSED, and summary judgment is RENDERED for the government on the cross-motion for summary judgment.

ENDRECORD

10

DeMOSS, Circuit Judge, dissenting:

I agree with the majority that the controlling issue in this case is "whether USAA is an 'automobile liability insurance[5] or no-fault insurance carrier.'" *Majority Opinion* at 4. I, however, come to a different conclusion than that reached by the majority.

---

[5]    Finding that Medpay is no-fault insurance, the majority does not address the issue of whether USAA is a third-party payer because it is "an automobile liability insurance . . . carrier." I would hold that, for 10 U.S.C. § 1095 purposes, USAA is not an automobile liability insurance carrier and, thus, not a third-party payer.

According to Department of Defense regulations, "automobile liability insurance" is "insurance against legal liability for health and medical expenses resulting from personal injuries arising from operation of a motor vehicle." 32 CFR § 220.12(a) (1993). This liability coverage protects the insured from liability for injuries sustained by third parties in automobile accidents involving the insured as operator of the insured's automobile. Medpay, on the other hand, is coverage that provides medical benefits for the insured when she is injured in an accident. It is not insurance against legal liability. Therefore, the Medpay coverage in the USAA's policy is not automobile liability insurance.

The government contends that § 1095 imposes liability for reimbursement on any company which provides automobile liability insurance, regardless of whether the policy in question is automobile liability insurance. It is undisputed that USAA provides automobile liability insurance, and thus could be considered, in a general sense, an automobile liability insurance carrier. I do not read § 1095 as expansively as the government. I do not read § 1095 as imposing a duty to reimburse on either a liability insurance carrier or a no-fault insurance carrier simply because the insurer issues those types of policies to other insureds; rather I read the statute as applying to the particular carrier who has issued a specific policy to an individual who is both an "insured" under such policy and is also simultaneously "a covered beneficiary" entitled to medical care in a military facility as contemplated by § 1095. The right of reimbursement, if any, in favor of the government is dependent upon the terms and provisions of a particular policy.

I read 10 U.S.C. § 1095, influenced by the legislative history, to clearly and unambiguously state that medical payment plans such as Medpay are not no-fault insurance. The legislative history makes clear that Congress used the phrase "no-fault insurance" to refer to *state adopted systems* of automobile insurance that pay regardless of fault. Congress did not use the term to describe any automobile insurance *policy* that contains one aspect of coverage which pays without regard to fault. Because Congress has clearly spoken to the issue, we must "give effect to the unambiguously expressed intent of Congress." ***Chevron, U.S.A. v. Natural Resources Defense Counsel***, 467 U.S. 837, 843 (1984). I would hold that Medpay is not no-fault insurance and USAA is not a third-party payer under § 1095. Accordingly, I respectfully dissent from the majority's opinion.

**I.**

The government argues that, under the regulations, USAA is a no-fault insurance carrier with respect to Medpay. No-fault insurance, the government maintains, is any insurance policy which pays regardless of fault. Department of Defense regulations define "no-fault insurance" as:

> an insurance contract providing compensa-
> tion for health and medical expenses
> relating to personal injury arising from
> the operation of a motor vehicle in which
> the compensation is not premised on who
> may have been responsible for causing
> such injury. No-fault insurance includes
> personal injury protection and medical

12

> payments benefits in cases involving personal injuries resulting from operation of a motor vehicle.

32 CFR § 220.12(I). USAA argues that the regulations are incorrect. USAA contends that no-fault insurance in § 1095 refers to a state adopted regime of automobile insurance that pays without regard to fault. It is the second sentence of this regulation which is the critical issue in this case.

The Supreme Court has given us guidance in reviewing agency regulations which interpret statutes. *Chevron,* 467 U.S. 837. "[T]he Supreme Court established a two-step method for judicial review of an agency's interpretation of a statute that it administers." *Mississippi Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 299 (5th Cir. 1994) (en banc). The court first must use the "traditional tools of statutory construction" to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-43 & n.9 (1984). If so, the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. However, "[i]f the statute is silent or ambiguous" on the particular issue, the court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.

"In determining whether Congress has directly spoken to the issue, the court may consider not only the plain meaning of the statute, but also any pertinent legislative history." *Doyle v.*

13

***Shalala***, 62 F.3d 740, 745 (5th Cir. 1995) *(citing **Chevron***, 467 U.S. at 845). The Supreme Court has made clear that the judiciary retains its right "to say 'what the law is,' that is, to interpret statutes." ***Mississippi Poultry***, 31 F.3d at 299 *(quoting **Chevron***, 467 U.S. at 843 n.9).

Accordingly, our first task is to determine whether the statute is ambiguous. If we determine that Congress has spoken to the issue, then our job is done; we will "give effect to the unambiguously expressed intent of Congress." ***Chevron***, 467 U.S. at 843. If, however, we find that Congress has not clearly spoken to the issue and the statute is ambiguous on its face, we then will look to legislative history to clarify the purpose. If legislative history is ambiguous, we will defer to the agency's interpretation if it is "based on a permissible construction of the statute." *Id*. at 843.

## II.

I agree with the majority that the statute is susceptible to more than one reasonable meaning and, thus, is ambiguous on its face. Therefore, we must consider the legislative history of the 1990 amendment. The committee reports of the House and Senate provide no additional guidance, as they merely restate the text of the amendment. *See* H. REP. No. 923, 101st Cong., 2d Sess., reprinted at 1990 U.S.C.C.A.N. 3110; H. REP. No. 665, 101st Cong., 2d Sess., reprinted at 1990 U.S.C.C.A.N. 2931; S. REP. No. 521,

14

101st Cong., 2d Sess.

In construing an amendment to a statute, however, it is important to understand the reason behind the amendment, or, as the Second Circuit has explained it, the "mischief" Congress sought to remedy with the amendment. *United States v. Clemente*, 608 F.2d 76, 79 (2d Cir. 1979) ("The amendment must be interpreted in terms of the mischief it was intended to rectify.") (*citing In re Letters Rogatory*, 385 F.2d 1017, 1020 (2d Cir. 1967)); 2A SUTHERLAND STATUTORY CONSTRUCTION § 45.09. A review of the history of the military's attempts to collect from third-parties in general, and of § 1095 in particular, clarifies Congress' intent. After such a review, it is apparent that the problem Congress was trying to remedy was the thwarting of the military's collection efforts caused by the passage of no-fault automobile insurance systems in many states.

Members of the United States military and their dependents are entitled to free medical care in military hospitals. 10 U.S.C. §§ 1074, 1076. Occasionally a service member will be injured due to the fault of another (often in an automobile accident) and the soldier will be treated in a military hospital. During World War II the military began seeking reimbursement from tort-feasors for the cost of treating injured soldiers. The authority for these actions was Army Regulation 25-220. *See* Capt. Dominique Dillenseger and Capt. Milo H. Hawley, *Sources of Medical Care Recovery in Automobile Accident Cases*, ARMY LAW. 50, 51

(October 1991) (hereinafter, "*Medical Care Recovery*"). The military continued to bring such claims until 1947 when the Supreme Court held that the federal government could not impose liability on tort-feasors who injure soldiers because Congress had not passed legislation authorizing the government to do so. **United States v. Standard Oil of California**, 332 U.S. 301, 315-16 (1947).

For 15 years Congress declined the Court's invitation to create liability for tort-feasors injuring soldiers. In 1960, however, a Comptroller General report revealed that the United States was losing significant sums of money due to unreimbursed healthcare expenditures provided to injured soldiers. COMPTROLLER GENERAL OF THE UNITED STATES, REVIEW OF THE GOVERNMENT'S RIGHTS AND PRACTICES CONCERNING RECOVERY OF THE COST OF HOSPITAL AND MEDICAL SERVICES IN NEGLIGENT THIRD PARTY CASES (1960) (cited in *Medical Care Recovery* at 51). Responding to the report, Congress in 1962 passed the Federal Medical Care Recovery Act ("FMCRA"), 42 U.S.C. § 2651, *et seq*. The FMCRA allows the government to recover from tort-feasors for medical expenses it provides to service members. The FMCRA allows recovery when the injury occurs "under circumstances creating a tort liability upon some third person." 42 U.S.C. § 2651(a). The law of the state where the injury takes place determines whether a tort has occurred. *Medical Care Recovery* at 51.[6]

---

[6] In some circumstances, the government can also recover under state law as a third-party beneficiary to the insurance contract.
(continued...)

Because tort liability is required for FMCRA recovery, the government could not recover in states which adopted no-fault automobile insurance laws. In states where no-fault automobile insurance laws have been adopted,[7] there is no tort liability for injuries sustained in automobile accidents. Instead, all individuals have insurance which pays regardless of who is at fault. 12A *Couch on Insurance* § 45:661, at 245-46 (2d ed. 1981).[8]

In 1990 the General Accounting Office (GAO) provided a report to Congress.[9] GAO, MILITARY HEALTH CARE: RECOVERY OF MEDICAL COSTS FROM LIABLE THIRD PARTIES CAN BE IMPROVED, GA1.13:NS1AD-40-49 (April 1990) (hereinafter, the "GAO report"). The GAO report noted that since the passage of the FMCRA:

> [S]ome states have . . . passed no-fault insurance laws that generally allow for

---

(...continued)
*See*, *e.g.*, ***United States v. Allstate Ins. Co.***, 910 F.2d 1281, 1283-84 (5th Cir. 1990). This is separate from the FMCRA and § 1095. ***United States v. State Farm Mutual Automobile Ins. Co.***, 936 F.2d 206, 209 (5th Cir. 1991). Neither party raises this issue, so we do not address it.

[7] In 1990, 21 states, the District of Columbia and Puerto Rico had some version of no-fault insurance applicable to automobile collision injuries.

[8] Medical payment coverages (such as Medpay) differ from policies under no-fault insurance systems in two key respects. First, Medpay is not required by statute; it is a voluntary add-on. Second, Medpay does not alter tort liability; it merely compensates the insured for any medical expenses he has incurred due to an automobile accident.

[9] Specifically, the report was addressed to the Chairman, Subcommittee on Readiness, Committee on Armed Services, House of Representatives.

17

> recovery by individuals from their own insurance companies irrespective of fault. Since no-fault laws by definition do not establish an at-fault or liable party, [the government's] legal ability to conduct recoveries under [the FMCRA] varies according to the no-fault statutes in these states.

GAO report at 4. The GAO report recommended "that the Congress enact legislation to enable recovery by the government in states with no-fault automobile insurance laws."[10]  *Id.*

The Department of Defense ("DOD"), when it promulgated its regulations to amended § 1095, recognized that the GAO report was what prompted Congress to amend § 1095 to include no-fault insurance carriers. 57 Fed. Reg. 41096 (1992) ("based on the GAO report, Congress supplemented current legal authority to collect in tort liability cases with new authority to also collect from no-fault insurance carriers").[11]

---

[10] I recognize that the majority does not consider my discussion of the GAO report to be legitimate legislative history because it is not a committee report or a statement from a congressman. *Majority Opinion* at 8 n.4. I do not share the majority's narrow view of legislative history. I consider quite instructive the agency report which, all parties agree, provided the impetus for Congress to act. A leading treatise on statutory construction notes that reports of non-legislative committees or commissions suggesting particular legislation "are considered valuable aids." SUTHERLAND STATUTORY CONSTRUCTION § 48.11 at 347. I consider the report of the GAO suggesting legislation to be similarly helpful.

[11] It appears, however, that the DOD misinterpreted the GAO report. The DOD described the GAO report as "recommend[ing] expanding [the government's] authority to cover *no-fault automobile insurance policies*. . . ." 57 Fed. Reg. at 41096 (emphasis added).
(continued...)

18

Thus, we see that Congress (1) was given a report detailing problems with collecting reimbursements in states with no-fault insurance systems; (2) was given a recommendation that the law be changed to allow the government to obtain reimbursements in states with no-fault insurance systems; and (3) then passed a law providing that the government can collect from "no fault insurance carriers." Based on these facts, it is clear that by the phrase "no fault insurance carriers," Congress meant insurance companies providing coverage in states with no-fault systems of automobile insurance. Congress was not referring to insurance companies providing automobile liability policies which contain coverages that pay regardless of fault. I found nothing in the legislative history which refers to the "medpay" coverage involved in the policies in this case.

In passing the 1990 amendments to § 1095, Congress provided that "[i]n cases in which tort liability is created upon some third person, collection from a third-party payer that is an automobile liability insurance carrier shall be governed by the provisions of [the FMCRA]." 10 U.S.C. § 1095(i)(2). Stated differently, when a third-party tortiously injures a service member in a state which uses traditional tort liability, the government

---

(...continued)
The GAO report did not refer to insurance policies, but instead recommended that "Congress enact legislation to enable recovery by the government in *states with no-fault automobile insurance laws*." GAO report at 4 (emphasis added).

19

must recover through the FMCRA, rather than § 1095.  This provision shows that Congress was concerned with state systems of fault or no-fault based insurance, rather than with individual insurance plans.  The fact that Congress was concerned with state insurance systems in § 1095(i)(2) is further evidence that Congress was referring to state systems of insurance when it used the term "no fault insurance carrier" in § 1095(h)(1).

Additional evidence that Congress was referring to no-fault systems when it amended § 1095 is found in a 1991 technical amendment to the statute.  Section 1095(i)(2) originally provided that "[i]n cases in which tort liability is created upon some third person, collection from a third-party that is an automobile liability *or no fault insurance* carrier shall be governed by the [FMCRA]."  (Emphasis added).  Congress quickly realized that the language "or no fault insurance" was out of place in a section concerning tort liability, so the phrase was deleted.  Pub.L. 102-190, § 714.  The House Report makes clear that this change is a "technical amendment" and that no substantive change is intended.  H.Rep. No. 60, § 717, *reprinted in* 1991 U.S.C.C.A.N. 918, 971.  Section 1095(i)(2) concerns states which have retained traditional tort liability.[12]  If the term "no fault insurance carrier" refers to particular policies, then it would properly be included in §

---

[12]  As discussed above, in a state with a no-fault system there is no tort liability, so the situation described in § 1095(i)(2) (the creation of tort liability upon a third party) will not occur.

1095(i)(2), as there can be no-fault coverages in auto liability policies when there is tort liability.[13]  If, however, "no fault insurance carrier" refers to systems, then it is out of place in a section discussing tort liability.

Based on the foregoing, it is apparent that the harm Congress sought to remedy with its 1990 amendments to § 1095 was the government's inability to get reimbursement for medical payments in states with no-fault insurance systems.  Considering the legislative history and the 1991 technical amendments, I find that § 1095 is not ambiguous.  Congress clearly intended "no fault insurance carrier" to refer to state systems that have eliminated tort as a theory of recovery and substituted insurance requirements that pay without regard to fault.  Congress has clearly spoken to the issue, and we, as well the executive branch, must defer to Congress.  *Mississippi Poultry,* 31 F.3d at 299 ("core democratic principle of congressional primacy" requires that we defer to Congress' clearly expressed intent).  Therefore, I would not follow the Department of Defense regulation defining no-fault insurance, 32 CFR §220.12(I), because it is contrary to Congress' clearly expressed intent.

---

[13] For  example, the tort-feasor could have insufficient insurance, so the no-fault policy would be needed to cover the medical expenses.

21

## III.

Medpay is not no-fault insurance. Therefore, USAA is not a "third-party payer" under § 1095 and, thus, is not required to reimburse the government for the medical expenses that the government incurred. I would affirm the district court's grant of summary judgment in favor of USAA and, therefore, I respectfully dissent.