Barbara WALTER and Laura Greene, Individually and on Behalf of Similarly Situated Individuals, Plaintiffs,

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant.

Civil Action No. 05–418.

United States District Court, E.D. Pennsylvania.

June 2, 2006.

Edmond A. Tiryak, Esquire, Wayne, PA, Rocco J. Iacullo, Disabilities Law Project, Philadelphia, PA, for Plaintiffs.

Douglas Diaz, Natalie Klyashtorny, Saul H. Krenzel, Saul H. Krenzel & Associates, Philadelphia, PA, for Defendant.

## MEMORANDUM

DuBOIS, District Judge.

Plaintiffs Barbara Walter ("Walter") and Laura Greene ("Greene") have mobility impairments. Am. Compl. ¶¶ 5–6. Prior to July 2004, both plaintiffs regularly used CCT Connect, a paratransit service provided by defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"). *Id.* ¶¶ 20, 24–25. However, in July 2004, SEPTA changed its eligibility criteria for paratransit services; as a result, plaintiffs are now only eligible for paratransit services during inclement weather. *Id.* ¶¶ 19–20, 25.

Plaintiffs filed suit individually and on behalf of other similarly situated individuals against SEPTA for violating the paratransit provision of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12143. Defendant filed a Motion to Dismiss the Amended Complaint.[1] For the reasons below, defendant's Motion to Dismiss is denied in part and granted in part.

## I. BACKGROUND

### A. *Facts*

The following facts are taken from plaintiffs' Amended Complaint.

Plaintiff Walter, a resident of Philadelphia, has multiple sclerosis and uses an electric scooter for mobility. Am. Compl. ¶ 5. She regularly travels to Center City, Philadelphia, for events such as Archdiocese meetings, National Multiple Sclerosis Society meetings, and social and cultural occasions. *Id.* Plaintiff Greene, a resident of Chester, Pennsylvania, has spina bifida and uses a wheelchair. *Id.* ¶ 6. She cur-

---

1. Originally, defendant filed a Motion to Dismiss or for Summary Judgment. The Court denied without prejudice the Motion for Summary Judgment on October 17, 2005.

rently attends court reporting classes at Orleans Technical School, located at 18th and Walnut Streets in Philadelphia. *Id.* Both plaintiffs are "disabled" under the ADA. 42 U.S.C. § 12102(2).[2]

■ Defendant SEPTA is a public transit authority. Am. Compl. ¶ 7. SEPTA operates several fixed route transportation systems, including fixed route bus service throughout Philadelphia and the surrounding suburbs, the Broad Street Subway line, the Market–Frankford Elevated Line, and a regional rail system. *Id.* SEPTA also operates CCT Connect, a paratransit system for those with disabilities.[3]

Prior to June 2004, both plaintiffs received transportation services via CCT Connect. *Id.* ¶¶ 19, 24. In June of 2004, SEPTA notified paratransit riders that all buses on its fixed route system were now equipped with wheelchair-accessible lifts and/or ramps. *Id.* ¶¶ 19, 24. Shortly thereafter, SEPTA informed both plaintiffs that they would only be eligible for paratransit services during inclement weather because they could now use the fixed route buses. *Id.* ¶¶ 20–21, 25–26.

Taking the bus to their destinations in Center City, Philadelphia, requires plaintiffs to use and transfer among several different bus routes. *Id.* ¶¶ 21, 26. Plaintiff Walter cannot use SEPTA's rail lines to reach her destinations in Center City because the stations she would use, the Walnut–Locust Station on the Broad Street Subway and the 13th Street Station on the Market–Frankford Elevated Line, are not yet fully accessible to individuals in wheelchairs. *Id.* ¶ 22. Plaintiff Greene

cannot use SEPTA's R2 regional rail line to reach Center City because the Chester Transportation Center, the closest rail station to her home, is not yet fully accessible to individuals in wheelchairs. *Id.* ¶ 27–28. The Walnut–Locust Station, the 13th Street Station, and the Chester Transportation Center are all "key stations" under the ADA. If these key stations were accessible, plaintiffs would be able to travel to Center City more quickly and directly than by taking bus routes. *Id.* ¶¶ 22, 26, 28.

### B. *Procedural History*

Plaintiffs filed their original Complaint on January 31, 2005. Defendant filed a Motion to Dismiss on March 15, 2005. After a telephone conference on September 1, 2005, the Court granted plaintiffs leave to file an Amended Complaint, which they did on September 16, 2005.[4] Defendant's original Motion to Dismiss was denied as moot. Defendant then filed the Motion to Dismiss the Amended Complaint on September 30, 2005. On January 26, 2006, the Court held oral argument on the Motion to Dismiss. Because defendants raised new arguments in that proceeding, the Court ordered supplemental briefing.

### C. *The Parties' Arguments*

Plaintiffs argue that because key stations on defendant's rail lines—specifically the Walnut–Locust Station on the Broad Street Subway, the 13th Street Station on the Market–Frankford Elevated Line, and the Chester Transportation Center on the R2 rail line—are not yet handicap accessi-

---

2. An individual is "disabled" under the ADA if she has "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A).

3. Paratransit is a system of mini-buses equipped with wheelchair lifts which provides door-to-door transportation services for dis-

abled persons. *See Eastern Paralyzed Veterans Ass'n of Pa. v. Southeastern Pennsylvania Transp. Auth.,* 1986 WL 11059, at *2 (E.D.Pa. Oct. 2, 1986).

4. Plaintiffs also filed a Motion for Class Certification on April 28, 2005. This motion is pending.

ble, they are eligible for paratransit service under 49 C.F.R. § 37.123(e)(2)(iii)(B). Defendant counters that, under the statutory definitions of paratransit eligibility found in 42 U.S.C. § 12143(c)(1)(A), plaintiffs are not eligible for paratransit services.

Defendant first argues that the regulations upon which plaintiffs base their eligibility claim, regulations promulgated by the United States Department of Transportation ("DOT"), are an unreasonable interpretation of the paratransit statute.[5] Second, even under the paratransit eligibility definitions found in the regulations, defendant argues that plaintiffs are not eligible for paratransit merely because a few key stations have not been made handicap accessible. Finally, defendant contends that plaintiff Greene is not eligible for paratransit because paratransit eligibility does not include commuter rail lines.

The Court will address each of these arguments in turn. Specifically, the Court will first decide whether the paratransit definitions found in 49 C.F.R. § 37.123(e) are a reasonable interpretation of the paratransit definitions found in 42 U.S.C. § 12143(c)(1)(A). If so, the Court must interpret the paratransit eligibility language found in 49 C.F.R. § 37.123(e)(2)(iii)(B), the regulation on which plaintiffs rely. Finally, the Court must determine whether 49 C.F.R. § 37.123(e)(2)(iii)(B) applies to individuals who use commuter rail, such as plaintiff Greene. Because plaintiff Greene's paratransit eligibility is contingent upon wheth-

er defendant must provide paratransit to complement commuter rail lines, the paratransit eligibility issues will be addressed separately for each plaintiff.

## II. APPLICABLE LAW—BOTH PLAINTIFFS

### A. *Standard of Review*

■ In deciding the Motion to Dismiss the Amended Complaint, the Court accepts as true the facts alleged in the Amended Complaint, drawing all reasonable inferences in favor of plaintiffs. *In re Merck & Co., Inc. Securities Litig.*, 432 F.3d 261, 266 (3d Cir.2005); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004). The Court will grant defendant's Motion to Dismiss only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations in the Amended Complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### B. *The Americans with Disabilities Act ("ADA")*

■ The purpose of the ADA, 42 U.S.C. §§ 12101, *et seq.*, is to eliminate discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1). Title II of the ADA covers discrimination in the provision of public services, including public transportation. §§ 12141, *et seq.* "Improving transportation services for disabled persons is a key component of the ADA." *Liberty Resources, Inc. v. Southeastern Pennsylvania Transp. Auth.*, 155 F.Supp.2d 242, 253 (E.D.Pa.2001).[6] "[A]c-

---

**5.** In its Supplemental Memorandum of Law, defendant argues that the DOT "went beyond its rule-making authority" in promulgating the paratransit eligibility regulation. Def. Supp. Memo. at 3. Since defendant relies on *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) in making this argument, the Court interprets it as a challenge to the reasonableness of the DOT's regulations.

**6.** Disability rights advocates targeted public transportation in their legislative and legal efforts. Martha T. McCluskey, Note, "Rethinking Equality and Difference: Disability Discrimination in Public Transportation," 97 Yale L.J. 863, 864 (1988). "[W]e want access, we want access to public transportation, has become the rallying cry of the disability civil rights movement in this country." *Americans with Disabilities Act of 1989: Hearing on S.*

cess to transportation is the key to opening up education, employment, recreation ... the other provisions of the [ADA] are meaningless unless we put together an accessible public transportation system in this country." *Americans with Disabilities Act of 1989: Hearing on S. 988 Before the Senate Committee on Labor and Human Resources*, 101st Cong. 169 (1989) (statement of Tim Cook, Executive Director, National Disability Action Center).

## III. PLAINTIFF WALTER'S PARATRANSIT ELIGIBILITY

### A. *Applicable Law*

1. *Paratransit services under the ADA* [7]

■ Paratransit is a "comparable transportation service required by the ADA for individuals with disabilities who are unable to use fixed route transportation systems." 49 C.F.R. § 37.3. "By 'paratransit,' we describe those transportation services, usually performed by wheelchair-accessible vans, that are provided to the handicapped separate from the mass transit's normal operations.... In general, paratransit is transportation that is provided upon request by the handicapped individual." *ADAPT v. Skinner*, 881 F.2d 1184, 1186 n. 1 (3d Cir.1989).

The paratransit provision of Title II of the ADA is found at 42 U.S.C. § 12143. It provides:

It shall be considered discrimination ... for a public entity which operates a fixed route system ... to fail to provide ... paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs, that are sufficient to provide to such individuals a level of service which is comparable to the level of designated public transportation services provided to individuals without disabilities.

§ 12143(a).

Section 12143 also requires that "each public entity which operates a fixed route system" provide paratransit to three categories of individuals:

(1) Any individual with a disability who is unable, as a result of a physical or mental impairment (including a vision impairment) and without the assistance of another individual (except an operator of a wheelchair lift or other boarding assistance device), to board, ride, or disembark from any vehicle on the system which is readily accessible to and usable by individuals with disabilities.

*988 Before the Senate Committee on Labor and Human Resources*, 101st Cong. 169 (1989) (statement of Tim Cook, Executive Director, National Disability Action Center).

7. Paratransit was used extensively before the passage of the ADA in 1990. Guidelines promulgated under the ADA's predecessor statutes, section 504 of the Rehabilitation Act of 1973 and the Urban Mass Transportation Act of 1970, required recipients of federal transportation funds to accommodate the transportation needs of the handicapped. Local transit authorities could comply with this requirement by making their buses handicap accessible (through the installation of wheel-

chair lifts), establishing a separate paratransit system, or both. *ADAPT v. Skinner*, 881 F.2d 1184, 1188 (3d Cir.1989). Prior to the passage of the ADA, approximately 44% of the nation's transit systems relied exclusively on paratransit to provide transportation to disabled individuals, and 38% provided a combination of lift-equipped buses and paratransit. *Americans with Disabilities Act of 1989: Hearing on S. 988 Before the Senate Committee on Labor and Human Resources*, 101st Cong. 729 (1989) (statement of Dennis D. Louwerse, Executive Director, Berks Area Reading Transportation Authority, on behalf of the American Public Transit Association).

(2) Any individual with a disability who needs the assistance of a wheelchair lift or other boarding assistance device (and is able with such assistance) to board, ride, and disembark from any vehicle which is readily accessible to and usable by individuals with disabilities if the individual wants to travel on a route on the system during the hours of operation of the system at a time (or within a reasonable period of such time) when such a vehicle is not being used to provide designated public transportation on the route.

(3) Any individual with a disability who has a specific impairment-related condition which prevents such individual from traveling to a boarding location or from a disembarking location on such system.

§ 12143(c)(1)(A).

Plaintiff Walters argues that she is eligible for paratransit services under Category 2. Her claimed eligibility is not based on the statutory language above, however; it is based on the regulations implementing paratransit at 49 C.F.R. § 37.123(e). The paratransit eligibility definitions in the regulation mirror the language of § 12143(c)(1)(A), except for the Category 2 definition. The Category 2 definition in the regulations designates specific situations in which a person is Category 2 eligible, including the following:

With respect to rail systems, an individual is eligible under this paragraph if the individual could use an accessible rail system, but—

(A) there is not yet one accessible car per train on the system; or

(B) key stations have not yet been made accessible.

8. Intercity rail systems have until 2010 to make key stations accessible. 42 U.S.C.

49 C.F.R. § 37.123(e)(2)(iii). Under this regulatory definition, plaintiff Walter argues that because key stations—specifically the Walnut–Locust Station on the Broad Street Subway, and the 13th Street Station on the Market–Frankford Elevated Line—which she would use for rail trips into Center City, Philadelphia, are not yet accessible, she is eligible for paratransit service under Category 2.

2. *The ADA and "key stations"*

The "key stations" language found in the Category 2 paratransit eligibility definition in 49 C.F.R. § 37.123(e)(2)(iii)(B) also appears in other statutory sections of the ADA. The ADA requires that key stations on rapid and light rail lines, including stations on intercity and commuter rail lines, be made handicap accessible. 42 U.S.C. §§ 12147(b)(1), 12162(e)(2)(A)(I). Transit authorities were given until July 26, 1993 to make key stations accessible on rapid and light rail lines.[8] However, if accessibility required "extraordinarily expensive structural changes," the transit authority could obtain an extension until 2020 if two-thirds of key stations were made accessible by 2010. § 12147(b)(2)(B). Similarly, transit authorities had until July 26, 1993 to make key stations on commuter rail lines accessible, but could obtain an extension until 2010 for "extraordinarily expensive structural changes." § 12162(e)(2)(A)(ii)(II).

The DOT gave public transportation entities the authority to define which stations were "key stations," considering the following criteria:

(1) Stations where passenger boardings exceed average station passenger boardings by at least fifteen percent,

§ 12162(e)(2)(A)(ii)(I).

unless such a station is close to another accessible station;

(2) Transfer stations on a rail line or between rail lines;

(3) Major interchange points with other transportation modes, including stations connecting with major parking facilities, bus terminals, intercity or commuter rail stations, passenger vessel terminals, or airports;

(4) End stations, unless an end station is close to another accessible station; and,

(5) Stations serving major activity centers, such as employment or government centers, institutions of higher education, hospitals or other major health care facilities, or other facilities that are major trip generators for individuals with disabilities.

49 C.F.R. § 37.47(b). Prior to the passage of the ADA, SEPTA and disabilities rights activists reached a settlement agreement determining which stations in the SEPTA system would be identified as key stations. § 37.53(a)(2). These key stations include the Walnut–Locust Station on the Broad Street Subway and the 13th Street Station on the Market–Frankford Elevated Line, the stations at issue in this suit. Am. Compl. ¶¶ 22, 27.

### 3. *Administrative Review*

■ When a party challenges regulations promulgated by an administrative agency, judicial review of those regulations begins with the two-step inquiry articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Court must first ask whether Congress has spoken to the question at issue. *Id.* at 842, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If the statute is "silent or ambiguous" on the specific issue, then the Court must determine whether the agency's regulation is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778.

■ If the agency's regulation is a reasonable interpretation of the statute, it will be accorded deference. *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). A regulation will be struck down only if it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. "A regulation is arbitrary and capricious when the agency fails to articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made." *ADAPT*, 881 F.2d at 1201 (internal quotations omitted).

### B. *Discussion*

To the Court's knowledge, no court in the nation has addressed the precise issue before it: whether the DOT's paratransit regulations found at 49 C.F.R. § 37.123(e) are a reasonable interpretation of the paratransit eligibility statute found at 42 U.S.C. § 12143(c)(1).[9]

---

**9.** Most suits challenging paratransit services have argued that the services provided are not "comparable" to public transportation services. *See, e.g., Anderson v. Rochester–Genesee Regional Transp. Auth.*, 337 F.3d 201 (2d Cir.2003); *Liberty Resources, Inc. v. Southeastern Pennsylvania Transp. Auth.*, 155 F.Supp.2d 242 (E.D.Pa.2001). One court has interpreted the Category 2 paratransit definition found in 49 C.F.R. § 37.123(e) as it applies to inaccessible buses routes. *Tandy v. City of Wichita*, 208 F.Supp.2d 1214, 1221–22 (D.Kan.2002), *rev'd in part*, 380 F.3d 1277 (10th Cir.2004). The parties in *Tandy* did not question the reasonableness of the paratransit regulations, however.

1. *The Category 2 paratransit statute is ambiguous*

Defendant argues that Congress "did indeed speak directly" to the question at issue by defining Category 2 paratransit eligibility in the statute at 42 U.S.C. § 12143(c)(1)(A)(ii). Def. Supp. Memo at 4.

To repeat, the statute defines Category 2 paratransit eligibility as:

Any individual with a disability who needs the assistance of a wheelchair lift or other boarding assistance device (and is able with such assistance) to board, ride, and disembark from any vehicle which is readily accessible to and usable by individuals with disabilities if the individual wants to travel on a route on the system during the hours of operation of the system at a time (or within a reasonable period of such time) when such a vehicle is not being used to provide designated public transportation on the route.

42 U.S.C. § 12143(c)(1)(A)(ii). In other words, under the statute, Category 2 eligibility covers disabled persons who use handicap accessible public transit vehicles and want to travel at a time when the accessible vehicles are not in use on a route.

■ For the reasons that follow, the Court concludes that this statutory language is ambiguous when applied to rail systems. Representative Thomas Luken, Chairman of the House Subcommittee on Transportation and Hazardous Materials, stated that the paratransit provision of the ADA "appears to be directed primarily at urban transportation, *to bus systems.*" *Americans With Disabilities Act: Hearing on H.R. 2273 and S. 933 Before the House Subcommittee on Transportation and Hazardous Materials,* 101st Cong. 123 (1989) (emphasis added). The DOT also noted that the "statutory [paratransit] system appears to be drafted with bus systems in mind." Transportation for Individuals with Disabilities, 56 Fed.Reg. 45,-584, 45,602 (Sept. 6, 1991).

Despite the fact that Category 2 eligibility appears to have been drafted with bus systems in mind, the paratransit statute applies to public entities which operate "fixed route systems," defined as a "system of providing designated public transportation" "by bus, *rail,* or any other conveyance." 42 U.S.C. §§ 12141(2), 12141(3), 12143(a) (emphasis added). During the rulemaking period, several comments asked the DOT to exempt rail systems from the paratransit requirements. The DOT refused to adopt this comment, however, "[g]iven the statutory requirement that complementary paratransit be provided for every fixed route system." Transportation for Individuals with Disabilities, 56 Fed.Reg. 45,584, 45,602 (Sept. 6, 1991). Thus, based on the statutory language and its interpretation by the DOT, the Court concludes that paratransit service applies to public transit entities which operate bus and/or rail systems.

The focus of the statute on bus systems is evident from its language. The paratransit statute uses the word "vehicle." While the Court will not go so far as to find that "vehicle" can never mean a train or a railcar, the word is more typically understood to mean a car or a bus, not a train. The New Shorter Oxford English Dictionary defines "vehicle" as a "means of conveyance, usually with wheels, for transporting people, goods etc.; a car, cart, truck, carriage, sledge, etc." 2 New Shorter Oxford English Dictionary 3554 (1993); *see also* American Heritage Dictionary 1906 (4th ed. 2000) ("A self-propelled conveyance that runs on tires."); Penguin English Dictionary 1561 (2d 2003) ("A car, bus, lorry, etc.").

This understanding of "vehicle" is reinforced by its use in other sections of the

ADA, which refer to "vehicles" separately from "rail passenger cars." *See* 42 U.S.C. § 12134© ("Regulations under ... this chapter shall include standards applicable to facilities and vehicles ... other than facilities, stations, *rail passenger cars,* and *vehicles.*") (emphasis added); § 12204(b) ("The supplemental guidelines ... shall establish additional requirements, consistent with this chapter, to ensure that buildings, facilities, *rail passenger cars,* and *vehicles* are accessible.") (emphasis added). When the ADA uses "vehicle" to refer to trains, it modifies the word. *See* 42 U.S.C. § 12142(a) (referring to "a new bus, a new rapid rail vehicle, a new light rail vehicle"); § 12148(b)(1) (referring to "vehicles operated as a train"). Moreover, in the section of the ADA which prohibits discrimination in public accommodations operated by private entities, the term "vehicle" is defined to specifically exclude a "rail passenger car." § 12181(11).

The Court concludes that the language defining Category 2 paratransit eligibility in 42 U.S.C. § 12143(c)(1)(A)(ii) focused on public bus systems despite the fact that Congress defined the paratransit service

to cover fixed route systems, which include public transit provided by rail.[10] This has created an ambiguity in the statute when Category 2 eligibility is applied to rail systems. Even the DOT noted the difficulty of applying the Category 2 eligibility definition to rail systems. "The first and third standards quite clearly apply to rail the same as they do to bus, but the second standard is somewhat more difficult to apply in the rail context." Transportation for Individuals with Disabilities, 56 Fed. Reg. 45,584, 45,602 (Sept. 6, 1991).[11] Because the statute is ambiguous, the Court must determine whether the DOT regulations defining Category 2 paratransit eligibility are a permissible construction of the statute.[12] *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *Mercy Home Health v. Leavitt,* 436 F.3d 370, 377 (3d Cir.2006).

2. *The Category 2 paratransit definition found in 49 C.F.R. § 37.123(e)(2)(iii)(B) is reasonable*

 In determining whether the DOT's Category 2 paratransit eligibility definition is a permissible construction of the statute, the Court must look to the

---

**10.** As discussed above, 42 U.S.C. § 12143(a) applies to public entities which operate "fixed route systems." A "fixed route system" is defined as a "system of providing designated public transportation." § 12141(3). In turn, "designated public transportation" is defined as transportation "by bus, *rail,* or any other conveyance." § 12141(2) (emphasis added).

**11.** As discussed in the section below, this difficulty is what led the DOT to use the key stations definition.

**12.** Even if the Court were to conclude that this statutory language was clear, the Court would not strike down the regulation found in 49 C.F.R. § 37.123(e)(2)(iii)(B), because the regulation does not conflict with the Category 2 statutory eligibility definition found in 42 U.S.C. § 12143(c)(1)(A)(ii). Cases finding a conflict between a statute and a regulation have faced conflicts much more direct than the one presented in this case. *See, e.g., Woodall v. Fed. Bureau of Prisons,* 432 F.3d 235,

249 (3d Cir.2005) (finding conflict "unavoidable" where statute provided that agency must consider several factors in making a prison placement decision but regulation provided that agency could not fully consider those factors); *Zheng v. Gonzales,* 422 F.3d 98, 119 (3d Cir.2005) (finding "clear and unmistakable" conflict where statute generally provided that aliens paroled in the United States could apply to adjust their status and regulation generally provided that aliens could not apply). The eligibility definition found in the paratransit regulations is *broader* than the definition found in the statute, not *contrary* to that definition. This is not a case where the agency's interpretation should be ignored because it "is contrary to an intent of Congress expressed in unequivocal terms." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992).

structure and language of the statute as a whole. *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. at 417, 112 S.Ct. 1394. "[W]e look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *Sekula v. F.D.I.C.*, 39 F.3d 448, 452 (3d Cir.1994). The Court will also consider the fact that Congress explicitly gave the DOT the authority to promulgate regulations to implement the required paratransit in 42 U.S.C. § 12143(b). "We have recognized a very good indicator of delegation meriting *Chevron* treatment is express congressional authorizations to engage in the process of rulemaking." *United States v. Mead Corp.*, 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) ("When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute.").

The purpose of the paratransit statute, 42 U.S.C. § 12143, is to provide transportation services to disabled persons that is comparable to the public transportation services available to non-disabled persons. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 673 (5th Cir.2004). By doing so, paratransit furthers the purpose of the ADA, which is to end discrimination against people with disabilities and to bring them into the economic and social mainstream of American life. H.R.Rep. No. 101–485(III), at 23 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 446. As the House Committee on Education and Labor noted, "[t]ransportation is the linchpin which enables people with disabilities to be inte-

grated and mainstreamed into society." H.R.Rep. No. 101–485(II), at 37 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 319. The DOT's Category 2 definition intentionally broadens the class of persons eligible for paratransit. *See* 49 C.F.R. part 37 app.D ("The second eligibility criterion is the broadest."). By providing paratransit to disabled persons who cannot access public transit, more individuals are able to leave their homes and participate in society, which furthers the intent of the ADA.

While not stated explicitly, it appears that in crafting the paratransit regulatory provisions, the DOT took a statute which was drafted with bus systems in mind, and applied it to rail systems by using the "key stations" language found in other parts of the ADA. *See* 42 U.S.C. § 12147(b)(1) ("[I]t shall be considered discrimination for a public entity that provides designated public transportation to fail ... to make key stations ... in rapid and light rail systems readily accessible to and usable by individuals with disabilities."), § 12162(e)(2)(A)(I) (similar). During the rulemaking period, the DOT received comments asking how the statutory Category 2 requirements would apply to rail systems. Transportation for Individuals with Disabilities, 56 Fed.Reg. 45,584, 45,602 (Sept. 6, 1991). Given that the ADA requires that key stations be made accessible by a specific date, using "key station" accessibility to define paratransit eligibility for rail systems provided a logical complement to the paratransit eligibility definition for bus systems.[13]

Thus, because Congress explicitly delegated authority to the DOT to promulgate paratransit regulations, and because the paratransit regulations further the intent of the ADA, the Court concludes that the DOT's interpretation of the statutory Cat-

---

**13.** According to counsel for defendant, SEPTA's key stations will be handicap accessible by 2010 or 2020 at the latest. Tr. 22:2–6.

egory 2 paratransit eligibility is reasonable. Nothing about DOT's Category 2 paratransit eligibility regulations is "arbitrary, capricious, or manifestly contrary" to the ADA. *ABF Freight System,* 510 U.S. at 324, 114 S.Ct. 835. "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 125 S.Ct. 2688, 2699, 162 L.Ed.2d 820 (2005); *Delaware River Stevedores v. DiFidelto,* 440 F.3d 615, 619 (3d Cir.2006) ("If the statute is silent or ambiguous with respect to a particular issue, then we must defer to the agency's regulation if it based on a reasonable construction of the statute.").

3. *Interpreting "key stations" and the paratransit eligibility language found in 49 C.F.R. § 37.123(e)(2)(iii)(B)*

■ Under the DOT regulations defining paratransit eligibility, which, as analyzed above, are a reasonable interpretation of the statutory eligibility definitions, an individual is within Category 2 if she "could use an accessible rail system, but key stations have not yet been made accessible." 49 C.F.R. § 37.123(e)(2)(iii)(B). Plaintiff Walter asserts that because key stations, specifically, the Walnut–Locust Station on the Broad Street Subway and the 13th Street Station on the Market–Frankford Elevated Line, are not yet accessible, she is entitled to paratransit. In response, defendant argues that the regulatory provision ("could use an accessible rail system, but key stations have not yet been made accessible") does not require them to provide paratransit until *all* key stations have been made accessible. Tr. 28:5–13.

There are several possible interpretations of the phrase "key stations have not yet been made accessible" found in the Category 2 eligibility definition. First, the Court could conclude that if *one* key station has been made accessible, an individual is not within Category 2 paratransit eligibility. Second, the Court could conclude that an individual is not within Category 2 paratransit eligibility if a certain number or percentage of key stations have been made accessible. Finally, the Court could conclude that an individual is within Category 2 paratransit eligibility unless the key stations which the individual seeks to use have been made accessible.

The Court rejects the first approach—concluding that an individual is not Category 2 paratransit eligible if one key station is accessible—as illogical. Using the Broad Street Subway Line as an example, suppose only the Pattison Street Station, located at the southern terminus of this north-south rail line, was handicap accessible. A disabled individual who lived near the Pattison Station could board the subway there, but would be unable to disembark at any station except Pattison. While riding the Broad Street Subway may be an enjoyable experience, a trip like this would be pointless, since the disabled individual would be unable to actually travel to a destination.[14] The purpose of public transit is to go from one location to another.

14. Similarly, suppose a disabled person lived on the north side of Philadelphia, near Temple University, and wanted to travel to a public meeting at City Hall, using the Broad Street Subway. However, the only handicap accessible station on the Broad Street Line is the Pattison Street Station. The accessibility of the Pattison Station, located several miles south of City Hall, is of no help to this disabled person.

The Court posed a similar hypothetical to defense counsel during oral argument. Counsel responded that, in such a situation, the accessibility of one key station, even if it was 15 miles away from where the disabled person lived, would be sufficient to make that

Unless both of those locations are handicap accessible, that purpose is defeated for disabled persons.

The Court also rejects the second approach—concluding that an individual is not within Category 2 paratransit eligibility if a certain number or percentage of key stations have been made accessible—as unmanageable. For example, the Court could conclude that, so long as two key stations are handicap accessible on any given rail line, an individual is not eligible for paratransit under Category 2, because two accessible stations enable a disabled person to embark at one location and disembark at another location. This would be an improvement over the first approach, which denied paratransit eligibility if only one key station had been made handicap accessible, but not much of an improvement. Again, using the Broad Street Subway Line as an example, suppose that both the Fern Rock Station, located at the northern terminus of the line, and the Pattison Street Station, located at the southern terminus of the line, were handicap accessible. This accessibility would be of little use to a disabled person who wished to ride the subway from Temple University, several miles south of the Fern Rock Station, into Center City, Philadelphia, several miles north of the Pattison Station.

The problem posed here is as follows: if more than two key stations must be accessible on a given rail line in order to deny Category 2 paratransit eligibility, how

does the Court go about choosing just how many key stations must be accessible? Would three be enough? Or four? Fifty percent? Two-thirds? The Court simply does not have the technical expertise to decide how many key stations must be handicap accessible to eliminate the need for paratransit and thus remove a disabled person from Category 2 paratransit eligibility. This is a task best left to an administrative agency.

Thus, the Court is left with the third approach: concluding that an individual is eligible for paratransit if she cannot use a rail system because key stations necessary for her trip have not been made accessible. 49 C.F.R. § 37.123(e)(2)(iii)(B). The Court finds this to be the most reasonable construction of the regulation consistent with the goals of the ADA.[15]

Public transit entities had until July 26, 1993 to make key stations handicap accessible. 42 U.S.C. § 12147(b)(2)(A). Such entities could have applied for an extension of this deadline to July 26, 2020, provided that the entity made two-thirds of key stations accessible by July 26, 2010.[16] § 12147(b)(2)(B). As key stations are made handicap accessible, there will be less need for paratransit services, a fact noted by the DOT itself. *See* 49 C.F.R. part 37 app. D (noting that the impact of the Category 2 paratransit eligibility definitions "should be reduced over time as transit systems become accessible"). Thus, under the statutory timetable, a conclusion that 49 C.F.R. § 37.123(e)(2)(iii)(B)

---

disabled person ineligible for paratransit. Tr. 32:16–33:1.

**15.** There is a fourth possible approach: concluding that an individual is eligible for paratransit unless *all* key stations have been made handicap accessible. However, this conclusion could lead to illogical results by allowing disabled individuals to take paratransit even if the key stations necessary for their trips are accessible simply because a key station some-

where else on the rail line is inaccessible. For that reason, this approach is rejected.

**16.** Public entities could only apply for the extension "with respect to key stations which need extraordinarily expensive structural changes to, or replacement of, existing facilities (e.g., installations of elevators, railing the entire passenger platform, or alterations of similar magnitude and cost)." 49 C.F.R. § 37.47(e).

requires that Category 2 paratransit eligibility continue until the key stations necessary for a disabled person's trip have been made accessible should not prove unduly burdensome for SEPTA.

Therefore, if an individual wishes to take trips that require her to use key stations which have not been made accessible, she is eligible for paratransit under 49 C.F.R. § 37.123(e)(2)(iii)(B).[17]

## IV. PLAINTIFF GREENE'S PARATRANSIT ELIGIBILITY

### A. The ADA and Commuter Rail

Plaintiff Greene's claim for paratransit is based on the ADA's applicability to commuter rail.[18] The paratransit requirements found in 42 U.S.C. § 12143 apply to public entities which operate "fixed route systems." § 12143(a). A "fixed route system" is defined as a "system of providing designated public transportation." § 12141(3). In turn, "designated public transportation" is defined as transportation "by bus, rail, or any other conveyance (*other than* transportation by aircraft or

intercity or *commuter rail transportation* )." § 12141(2) (emphasis added). Within the paratransit administrative regulations, 49 C.F.R. 37.121(c) explicitly states that "[r]equirements for complementary paratransit *do not apply* to commuter bus, *commuter rail*, or intercity rail systems" (emphasis added).[19]

 As defined in the regulations, a "commuter rail" system is a "short-haul rail passenger service operating in metropolitan and suburban areas, whether within or across the geographical boundaries of a state, usually characterized by reduced fare, multiple ride, and commutation tickets and by morning and evening peak period operations." 49 C.F.R. § 37.3. SEPTA's regional rail system has these "commuter rail" characteristics, as it operates within the Philadelphia metropolitan and suburban area, offers reduced fare and multiple ride tickets, and has its peak periods of operations in the morning and evening.[20] SEPTA, *Regional Rail, at* http://www.septa.org /service/rideguide/ ride—regional—rail .html (May 2, 2006).[21]

---

17. The fact that a disabled individual could use buses to reach her destinations instead of rail lines, as defendant would have her do, is irrelevant. As the DOT noted, Category 2 paratransit eligibility persists:

> even if bus systems covering the area served by the rail systems have become 100 percent accessible. This is necessary because people use rail systems for different kinds of trips than bus systems. It would often take much more in the way of time, trouble, and transfers for a person to go on the buses of one or more transit authorities than to have a direct trip provided by the rail operator.

49 C.F.R. part 37 app. D.

18. The ADA requires that commuter rail services become handicap accessible by making one car per train accessible and making key stations accessible. 42 U.S.C. § 12162(b).

19. The DOT drafted this regulation in response to public comments. "Though it is clear from the statute, a number of commenters wanted an explicit statement in the rule that the commuter bus and commuter rail

systems are not required to provide complementary paratransit." Transportation for Individuals with Disabilities, 56 Fed.Reg. 45,-584, 45,600 (Sept. 6, 1991).

20. SEPTA began operating commuter rail service on January 1, 1983, when it assumed operation of thirteen commuter rail lines from the Consolidated Rail Corporation, or Conrail, a federal entity. *Southeastern Pennsylvania Transp. Auth. v. Pennsylvania Public Utility Com'n,* 826 F.Supp. 1506, 1511 (E.D.Pa.1993).

21. In deciding a motion to dismiss, a court may generally only consider the facts asserted in the complaint, any attachments to the complaint, and facts of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). A court may also take judicial notice of facts which are not subject to reasonable dispute and generally known within the territorial jurisdiction of the court under Fed.R.Evid. 201. *Smith v. Litton Loan Servicing, LP,* 2005

Plaintiff Greene does not dispute that SEPTA's regional rail system falls within the ADA definition of commuter rail. Instead, she argues that 49 C.F.R. § 37.121(c) only exempts entities that *solely* provide commuter rail services. Tr. 54:10–23. Because defendant operates commuter rail as part of a comprehensive transit system, which includes intracity rail and bus, plaintiffs argue that the exception found in 49 C.F.R. § 37.121(c) does not apply to the paratransit services provided by defendant to plaintiff Greene. *Id.* The Court rejects this argument.

### B. *Paratransit Eligibility Does Not Apply to Commuter Rail*

■ Once again, no court has interpreted the commuter rail exception found in 49 C.F.R. § 37.121(c) or determined whether paratransit eligibility applies to disabled individuals wanting to use commuter rail. Nevertheless, the Court concludes that the statutory and regulatory language of the ADA clearly exempts commuter rail from paratransit eligibility. Nothing in the language of the statute or the regulation supports plaintiff's construction—that the commuter rail exception applies only if the commuter rail is operated by a transit entity that solely provides commuter rail services. To the contrary, the regulation states that "[r]equirements for complementary paratransit *do not apply* to commuter bus, *commuter rail,* or intercity rail systems." 49 C.F.R. § 37.121(c) (emphasis added). The plain meaning of the regulation is that paratransit requirements do not apply to commuter rail systems. Nothing in the regulation qualifies this statement by the type of transit authority that operates the commuter rail system, or whether that transit authority also operates intracity rail and/or bus systems.

This interpretation of the ADA is supported by its legislative history. In its report on the ADA, the House Committee on Energy and Commerce remarked that the statute "imposes no requirement that Amtrak or commuter railroads provide paratransit or other special transportation services of the nature described in section 211(c)." [22] H.R.Rep. No. 101–485(IV), at 53 (1990), *reprinted in* 1990 U.S.C.C.A.N. 512, 542. The Committee went on to clarify that the statute should *not* be read "to imply any obligation on Amtrak or commuter railroads to provide paratransit or other special transportation services *merely because Amtrak or any commuter railroads are associated with a person who is subject to the requirements of section 211(c).*" *Id.* at 53–54 (emphasis added).[23]

WL 289927, at *5 (E.D.Pa. Feb. 4, 2005). In this jurisdiction, it is generally known that SEPTA operates a commuter rail system; therefore, the Court will take judicial notice of this fact. *Cf., Southeastern Pennsylvania Transp. Auth. v. Pennsylvania Public Utility Com'n,* 826 F.Supp. at 1511 (describing history of SEPTA's "commuter rail" service).

**22.** Section 211(c) is the paratransit provision of the ADA; it is codified at 42 U.S.C. § 12143(a). H.R.Rep. No. 101–485(IV), at 40 (1990), *reprinted in* 1990 U.S.C.C.A.N. 512, 529.

**23.** Jeffrey Shane, Assistant Secretary for Policy and International Affairs at DOT, testified before the House Subcommittee on Transportation and Hazardous Materials. When asked whether the paratransit provisions applied to Amtrak, he stated "I wouldn't want to promise you that anybody won't make an argument that paratransit applies to either Amtrak or commuter rail, but we think that would be a reach in terms of what we understand the legislative intent to have been." *Americans With Disabilities Act: Hearing on H.R. 2273 and S. 933 Before the House Subcommittee on Transportation and Hazardous Materials,* 101st Cong. 123 (1989). Representative Luken, the Subcommittee Chairman, reinforced this interpretation by stating that paratransit "would appear not to be intended to apply to commuter rail." *Id.* And Dennis Cannon, an accessibility specialist with the Architectural Transportation Barriers Compliance Board, agreed that "our interpretation of the bill is that paratransit is not something that was

Thus, even if an entity is required to provide paratransit under 42 U.S.C. § 12143, that entity is not required to provide paratransit in conjunction with its commuter rail service.

The decision by Congress to not provide paratransit service to those who cannot access commuter rail stations is rational. Commuter rail brings individuals into cities from far-flung locations. In the case of the defendant, SEPTA's commuter rail reaches communities such as Trenton, New Jersey and Wilmington, Delaware. See SEPTA, *Clickable Rail System Map, at* http://www.septa.org /maps/click—map. html (May 11, 2006). Requiring defendant to provide paratransit based on inaccessible commuter rail stations could prove exceedingly costly. Not only would the paratransit vehicles have to travel much greater distances, but the lower density of population in non-urban areas would mean fewer possibilities for combined trips. As Jeffrey Shane, Assistant Secretary for Policy and International Affairs at DOT, testified before the House Subcommittee on Transportation and Hazardous Materials, "[t]he distances involved in commuter rail or intercity rail are both beyond that which we think paratransit was designed to cover." *Americans With Disabilities Act: Hearing on H.R. 2273 and S. 933 Before the House Subcommittee on Transportation and Hazardous Materials,* 101st Cong. 123 (1989).

The Court is not unsympathetic to plaintiff Greene, who must take numerous bus and/or rail routes to reach destinations in Center City, Philadelphia instead of taking one commuter rail trip via the R2 line, as a non-disabled person can. Am. Compl. ¶ 28. However, the ADA simply does not require that SEPTA provide her with paratransit for these trips.

intended to be required of the commuter au-

## V. CONCLUSION

The ADA paratransit statute, 42 U.S.C. § 12143, and the implementing regulations found at 49 C.F.R. § 37.123, require that a transit authority provide paratransit service to disabled individuals who cannot use a rail system because key stations necessary for a trip have not been made accessible. The statute does not require, however, that paratransit services be provided to individuals who wish to use a commuter rail line. This result furthers the ADA's goal of bringing disabled people into the mainstream of American society without imposing prohibitive costs on transit authorities.