PRISCILLA R. OWEN, Circuit Judge,
dissenting:
There is a gap in the reasoning of the majority opinion that cannot be bridged. The area at issue is not presently’ “essential for the conservation of the [endangered] species”[1] because it plays no part in the conservation of that species. Its biological and physical characteristics will not support a dusky gopher frog population. There is no evidence of a reasonable probability (or any probability for that matter) that it will become “essential” to the conservation of the species because there is no evidence that the substantial alterations and maintenance necessary to transform the area into habitat suitable for the endangered species will, or are likely to, occur. Land that is not “essential” for conservation does not meet the statutory criteria for “critical habitat.”[2]
*481 The majority opinion interprets the Endangered Species Act[3] to allow the Government to impose restrictions on private land use even though the land: is not occupied by the endangered species and has not been for more than fifty years; is not near areas inhabited by the species; cannot sustain the species without substantial alterations and future annual maintenance, neither of which the Government has the authority to effectuate, as it concedes; and does not play any supporting role in the existence of current habitat for the species. If the Endangered Species Act permitted the actions taken by the Government in this case, then vast portions of the United States could be designated as “critical habitat” because it is theoretically possible, even if not probable, that land could be modified to sustain the introduction or reintroduction of an endangered species.
The majority opinion upholds the governmental action here on nothing more than the Government’s hope or speculation that the landowners and lessors of the 1,544 acres at issue will pay for removal of the currently existing pine trees used in commercial timber operations and replace them with another tree variety suitable for dusky gopher frog habitat, and perform other modifications as well as future annual maintenance, that might then support the species if, with the landowners’ cooperation, it is reintroduced to the area. The language of the Endangered Species Act does not permit such an expansive interpretation and consequent overreach by the Government.
Undoubtedly, the ephemeral ponds on the property at issue are somewhat rare. But it is undisputed that the ponds cannot themselves sustain a dusky gopher frog population. It is only with significant transformation and then, annual maintenance, each dependent on the assent and financial contribution of private landowners, that the area, including the ponds, might play a role in conservation. The Endangered Species Act does not permit the Government to designate an area as “critical habitat,” and therefore use that designation as leverage against the landowners, based on one feature of an area when that one feature cannot support the existence of the species and significant alterations to the area as a whole would be required.
The majority opinion’s holding is unprecedented and sweeping.
I
A Final Rule [4] of the United States Fish and Wildlife Service (the “Service”) designated 12 units of land encompassing 6,477 acres as “critical habitat”[5] for the dusky gopher frog. Eleven of those units, totaling 4,933 acres, are in four counties in Mississippi,[6] and they are not at issue in this appeal. It is only the owners and lessors of the twelfth unit, comprised of 1,544 acres in Louisiana and denominated Unit 1 by the Service,[7] that have appealed the designation. The dusky gopher frog species was last seen in Louisiana in 1965 in one small pond located on Unit l.[8]
The Service specifically found in its Final Rule that Unit 1 contains only one of the physical or biological features and habitat characteristics required to sustain the *482 species’ life-history processes.[9] That characteristic is the existence of five ephemeral ponds on the Louisiana property. The Service acknowledged that the other necessary characteristics were lacking, finding, among its other conclusions, that “the surrounding uplands are poor-quality terrestrial habitat for dusky gopher frogs.”[10] While the Service was of the opinion that “[although the uplands associated with the ponds do not currently contain the essential physical or biological features of critical habitat, we believe them to be re-storable with reasonable effort”[11] to permit habitation, the Service candidly recognized in the Final Rule that it could not undertake any efforts to change the current features of the land or to move frogs onto the land without the permission and cooperation of the owners of the land.[12] It cited no evidence, and there is none, that “reasonable efforts” would in fact be made to restore “the essential physical or biological features of critical habitat” on Unit 1. The Service cited only its “hope” that such alterations would be taken by the landowners.[13]
In particular, the Service found that an open-canopied longleaf pine ecosystem is necessary for the habitat of this species of frog.[14] Approximately ninety percent of the property is currently covered with closed-canopy loblolly pine plantations. These trees would have to be removed or burned and then replaced with ánother tree variety to allow the establishment of the habitat that the Service has concluded is necessary for the breeding and sustaining of a dusky gopher frog population. It is undisputed that the land is subject to a timber lease until 2043, timber operations are ongoing, and neither the owner of the property nor the timber lessee is willing to permit the substantial alterations that the Service concluded would be necessary to restore the potentiality of the ponds and surrounding area as habitat for this species of frog.
II
Review of the Service’s decisions under the Endangered Species Act is governed by the Administrative Procedure Act (APA).[15] The Service’s designation of the land at issue as “critical habitat” was “not in accordance with law” and was “in excess of statutory ... authority” within the meaning of the APA.[16]
*483 The Endangered Species Act defines “critical habitat” as:
(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1538' of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.[17]
The Final Rule reflects that “Unit 1 is not currently occupied nor was it occupied at the time the dusky gopher frog was listed [as an endangered species].”[18] Accordingly, the authority of the Service to designate this area as “critical habitat” is governed by subsection (ii). The statute requires that Unit 1 must be “essential for the conservation of the species” or else it cannot be designated as “critical habitat.”
The word “essential” means more than desirable. Black’s Law Dictionary defines “essential” as “2. Of the utmost importance; basic and necessary. 3. Having real existence, actual.”[19] The Service’s conclusion that Unit 1 is “essential” for the conservation of the dusky gopher frog contravenes these definitions. Unit 1 is not “actually]” playing any part in the conservation of the endangered frog species. Nor is land “basic and necessary” for the conservation of a species when it cannot support the existence of the endangered species unless the physical characteristics of the land are significantly modified. This is particularly the case when the Government is powerless to effectuate the desired transformation unless it takes (condemns) the property and funds these efforts. There is no evidence that the modifications and maintenance necessary to transform Unit 1 into habitat will be undertaken by anyone.
The Government’s, and the majority opinion’s, interpretation of “essential” means that virtually any part of the United States could be designated as “critical habitat” for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it. This is not a reasonable construction of § 1532(5)(A)(2).
We are not presented with a case in which land, though unoccupied by an endangered species, provides elements to neighboring or downstream property that are essential to the survival of the species in the areas that it does occupy. For example, the Ninth Circuit concluded that certain areas, though unoccupied, were “essential” to an endangered species (the Santa Ana sucker, a small fish) because the designated areas were “the primary sources of high quality coarse sediment for the downstream occupied portions of the Santa Ana River,” and that “coarse sediment was essential to the sucker because [it] provided a spawning ground as well as a feeding ground from which the sucker obtained algae, insects, and detritus.”[20] In *484 the present case, Unit 1 does not support, in any way, the existence of the dusky gopher frog or its habitat. Our analysis therefore concerns only whether the property is “essential for the conservation of the species” as an area that might be capable of occupation by the dusky gopher frog if the area were physically altered.
The majority opinion cites the Ninth Circuit’s decision regarding the Santa Ana sucker as support for the majority opinion’s assertion that “[tjhere is no habitability requirement in the text of the ESA or the implementing regulations. The statute requires the Service to designate ‘essential’ areas, without further defining ‘essential’ to mean ‘habitable.’ ”[21] I agree with that statement — up to a point. Land can be “essential” even though uninhabitable if it provides elements to the species’ habitat that are essential to sustain it, as was the case regarding the Santa Ana sucker. The majority opinion says instead that land can be designated as “critical habitat” even if it is not habitable and does not play any role in sustaining the species. The Ninth Circuit did not announce such a sweeping interpretation of the Endangered Species Act. That court held only that land not occupied by the species could constitute critical habitat because of the “essential” role it played in the survival of species as the primary source of sediment necessary for the spawning of the species.[22] The majority opinion has not cited any decision from the Supreme Court or a Court of Appeals which has construed the Endangered Species Act to allow designation of land that is unoccupied by the species, cannot be occupied by the species unless the land is significantly altered, and does not play any supporting role in sustaining habitat for the species.
The meaning of the word “essential” undoubtedly vests the Service with significant discretion in determining if an area is “essential” to the conservation of a species, but there are limits to a word’s meaning and hence the Service’s discretion. The Service’s interpretation of “essential for the conservation of the species”[23] in the present case goes beyond the boundaries of what “essential” can reasonably be interpreted to mean. As the Supreme Court has explained, “an agency’s interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear.”[24]
In MCI Telecommunications Corp. v. AT&T Co., 23 U.S.C. § 203(a) required long-distance communications common carriers to file tariffs with the Federal Communications Commission (FCC).[25] The FCC was authorized under 23 U.S.C. § 203(b)(2) to “ ‘modify any requirement made by or under the authority of this section either in particular instances or by general order applicable to special circumstances or conditions.’ ”[26] In a rulemaking proceeding, the FCC made rate tariff filings optional for all non-dominant long-distance carriers.[27] In subsequent proceedings, AT&T challenged the FCC’s statutory authority to do so, and the FCC took the position that its authority was derived from the “modify any requirement” provi *485 sion in § 203(b). The Supreme Court determined that “modify” “connotes moderate change,”[28] and examined extensively other provisions of the Communications Act.[29] The Supreme Court concluded that eliminating tariff rate filings for a segment of the industry was “much too extensive to be considered a ‘modification.’ ”[30] The Court observed, “[wjhat we have here, in reality, is a fundamental revision of the statute, changing it from a scheme of rate regulation in long-distance common-carrier communications to a scheme of rate regulation only where effective competition does not exist. That may be a good idea, but it was not the idea Congress enacted into law in 1934.”[31] The same can be said of the Service’s, and the majority opinion’s, construction of the Endangered Species Act in the present case. It may be a good idea to permit the Service to designate any land as “critical habitat” if it is theoretically possible to transform land that is uninhabitable into an area that could become habitat. But that is not what Congress did.
The District of Columbia Circuit Court held in Southwestern Bell Corp. v. FCC that an agency’s interpretation of a statute is not entitled to deference when that interpretation “ ‘goes beyond the meaning that the statute can bear.’ ”[32] That court was fully cognizant of Chevron’s[33] teaching that “ ‘if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.’ ”[34] In Southwestern Bell, the FCC contended that because the term “schedules” was not defined in the Federal Communications Act, the FCC could permit carriers to file ranges of rates rather than specific rates.[35] The District of Columbia Circuit disagreed, concluding that “[sjection 203(a) ... lays out what kind of filing the statute requires: ‘schedules showing all charges.’ This language connotes a specific list of discernable rates; it does not admit the concept of ranges.”[36]
The majority opinion says that MCI Telecommunications Corp. is distinguishable because in that case, the agency’s interpretation of “modify” “flatly contradicted the definition provided by ‘virtually every dictionary [the Court] was aware of.’ ”[37] The majority opinion then observes that one definition of “essential” is “of the utmost importance; basic and necessary,” and concludes that this definition “describes well a close system of ephemeral ponds, per the scientific consensus that the Service relied upon.”[38] This highlights the opinion’s misdirected focus and frames the question that is at the heart of this case. That question is whether the Endangered Species Act permits the Service to desig *486 nate land as critical habitat when the land has only one physical or biological feature that would be necessary to support a population of the endangered species but lacks the other primary physical or biological features that are also necessary for habitat. It is undisputed that ephemeral ponds alone cannot support a dusky gopher frog population. All likewise agree that Unit 1 lacks the other two primary constituent elements, which are upland forested non-breeding habitat dominated by longleaf pine maintained by fires, and upland habitat between breeding and nonbreeding habitat with specific characteristics including an open canopy, native herbaceous species, and subservice structures. Unit 1 is not “essential [i.e., of the utmost importance; basic and necessary] for the conservation of the species”[39] because it cannot serve as habitat unless the forests in the areas upland from the ponds are destroyed and the requisite vegetation (including a new forest) is planted and maintained. Because there is no reasonable probability that Unit 1 will be altered in this way, it is not “essential.”
The Service’s implicit construction of the meaning of “essential for the conservation of the species” is not entitled to deference because it exceeds the boundaries of the latitude given to an agency in construing a statute to which Chevron deference is applicable. The term “essential” cannot reasonably be construed to encompass land that is not in fact “essential for the conservation of the species.” When the only possible basis for designating an area as “critical habitat” is its potential use as actual habitat, an area cannot be “essential for the conservation of the species” if it is uninhabitable by the species and there is no reasonable probability that it will become habitable by the species. Even if scientists agree that an area could be modified to sustain a species, there must be some basis for concluding that it is likely that the area will be so modified. Otherwise, the area could not and will not be used for conservation of the species and therefore cannot be “essential” to the conservation of the species.
With great respect, at other junctures, the majority opinion misdirects the inquiry as to the proper meaning of “essential for the conservation of the species.” The opinion examines an irrelevant question in arguing that there is no “temporal requirement” in the text of the Endangered Species Act. For example, the opinion states that the Service is not required “to know when a protected species will be conserved as a result of a designation.”[40] Similarly, the majority opinion observes that the Act does not “set[ ] a deadline for achieving this ultimate conservation goal.”[41] I agree. The Act does not require the Service to speculate whether or when an endangered species will no longer require conservation efforts at the time the Service designates “critical habitat.” But in designating an area as “critical habitat,” the question is not when the species will be conserved, which is the question that the majority opinion raises and then dismisses. Nor is it a question of when the area will be essential. Rather, the pertinent inquiry is whether the area is essential for conservation. An area cannot be essential for use as habitat if it is uninhabitable and there is no reasonable probability that it could actually be used for conservation.
*487 The majority opinion fails to discern the meaningful boundary that the term “essential” places on the Service in designating “critical habitat.” The opinion fails to appreciate the distinction between land that, because of its physical and biological features, cannot be used for conservation without significant alteration and land that, is actually habitable but not occupied by the species.[42] The majority opinion posits that “[the Landowners’ logic] would also seem to allow landowners whose land is immediately habitable to block a critical-habitat designation merely by declaring that they will not — now or ever — permit the reintroduction of the species to their land.”[43] The fact that a landowner is unwilling to permit the reintroduction of a species does not have a bearing on whether the physical and biological features of the land make it suitable as habitat. Land that is habitable but unoccupied by the species may be “essential” if the areas that a species currently occupies are inadequate for its survival. Even if the landowner asserts that it will not allow introduction of the species, the Service may designate the land as “critical habitat” because it is in fact habitable, and the consultation and permitting provisions of the Act may be used to attempt to persuade the owner to not destroy the features that make the area habitable and to allow the species to be reintroduced. However, when land would have to be significantly modified to either serve as habitat or to serve as a source of something necessary to another area that is habitat (such as the sediment in the Santa Ana sucker case), then whether there is a probability that the land will be so modified must be part of the equation of whether the area is “essential.” Unless the land is modified, it is useless to the species and therefore cannot be “essential.” Under such circumstances, the Service cannot designate land as “critical habitat” unless there is an objective basis for concluding that modifications will occur because otherwise, the land cannot play a role in the species’ survival.
The majority opinion rejects the logical limits of the word “essential” in concluding that requiring either actual use for conservation or a reasonable probability of use for conservation to satisfy the “essential for the conservation of the species” requirement in the statute would be reliant on the subjective intentions of landowners.[44] Whether there is a reasonable probability that land will be modified so that it is suitable as habitat is an objective inquiry that would consider many factors. Those factors might well (and in most instances probably would) include economic considerations such as the values of various uses of the land. The inquiry would be whether a reasonable landowner would be likely to undertake the necessary modifications. In some cases, a landowner might have entered into an agreement to modify land so that it may be used as habitat, and in such a case, there would be nothing “subjective” in concluding that it is reasonably probable that the land will actually be used as habitat and therefore “essential” for the conservation of the species.
The majority opinion’s interpretation of the Endangered Species Act is illogical, inconsistent, and depends entirely on adding words to the Act that are not there. Those words are “a critical feature.”[45] On *488 one hand, the majority opinion says that “we find it hard to see how the Service would be able to satisfactorily explain” the designation of an empty field as habitat.”[46] Yet, in the next paragraph, the opinion says that because the designation in this case “was based on the scientific expertise of the agency’s biologists and outside gopher frog specialists,” this court is required to affirm the “critical habitat” designation.[47] It is easily conceivable that “the best scientific data available”[48] would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species.
Apparently recognizing that unless cab-ined in some way, the majority opinion’s holding would give the Service unfettered discretion to designate land as “critical habitat” so long as scientists agree that uninhabitable land can be transformed into habitat, the majority opinion asserts that at least one “physical or biological feature[ ] ... essential to the conservation of the species”[49] must be present to permit the Service to declare land that is uninhabitable by the species to be “critical habitat.” It must be emphasized that this is the linchpin to the majority’s holding. When the only potential use of an area for conservation is use as habitat, the Service cannot designate uninhabitable land as “critical habitat,” the majority opinion concedes, even if scientists agree that the land could be altered to become habitat.[50] But, the opinion says, if, as in the present case, there is at least one physical or biological feature essential to the conservation of the species (also denominated by the Service as a primary constituent element, as explained in footnote 12 of the majority opinion), the presence of one, and only one, of three indispensable physical or biological features required for habitat is sufficient to allow the Service to designate uninhabitable land as “critical habitat.” The opinion says:
Here, the Service confirmed through peer review and two rounds of notice and comment a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature — the ephemeral ponds — which justified its finding that Unit 1 was essential for the conservation of the dusky gopher frog.[51]
This re-writes the Endangered Species Act. It permits the Service to designate an area as “critical habitat” if it has “a critical feature” even though the area is uninhabitable and does not play a supporting role to an area that is habitat. Neither the words “a critical feature” nor such a concept appear in the Act. The touchstone chosen by Congress was “essential.” The existence of a single, even if rare, physical characteristic does not render an area “essential” when the area cannot support the species because of the lack of other necessary physical characteristics.
The majority opinion’s reasoning also suffers from internal inconsistency. The *489 opinion asserts that, unlike land that is occupied by the species, there is no requirement under the Endangered Species Act that unoccupied land “must contain all of the relevant [physical or biological features]”[52] that are “essential to the conservation of the species”[53] before the Secretary may designate it as critical habitat.[54] This clearly implies, if not states, that the Secretary can designate unoccupied land as critical habitat even if the land has no primary constituent physical or biological element (to use the Service’s vernacular) essential to the conservation of the species.[55] If land, can be “essential for the conservation of the species” even when it has no physical or biological features essential to the conservation of the species, then what, exactly, is it about the land that permits the Service to find it “essential”? The majority opinion does not answer this question. Instead, a few pages after making the assertion that unoccupied land can be designated even when it has no features essential to the conservation of the species, the opinion rejects this proposition.[56] The majority opinion says (in attempting to counter the argument that its holding would permit the Service to designate an empty field as critical habitat even though not habitable) that it would be arbitrary and capricious for the Service to find an empty field “essential” if there were other similar fields.[57] The opinion concludes that if land that is uninhabitable could be modified to become habitat, the Service could not deem the land “essential” if there were other parcels of land similar to it that could also be modified:
We fail to see how the Service would be able to similarly justify as rational an essentiality finding as to arbitrarily chosen land. In contrast, the dissent, similar to the Landowners, contends that “[i]t is easily conceivable that ‘the best scientific data available’ would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species.” Even assuming that to be true, it does not follow that scientists or the Service would or could then reasonably call an empty field essential for the conservation of a species. If the field in question were no different than any other empty field, what would make it essential? Presumably, if the field could be modified into suitable habitat, so could any of the one hundred or one thousand other similar fields. If the fields are fungible, it would be arbitrary for the Service to label any single one “essential” to the conservation of a species. It is only by overlooking this point that the dissent can maintain that our approval of the Service’s reading of “essential” will “mean[ ] that virtually any part of the United States could be designated as ‘critical habitat’ for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it.”[58]
I have difficulty with this reasoning. There is undeniably a textual difference in the Endangered Species Act between the sections dealing with an area occupied by *490 the species and an area unoccupied by that species. If Congress did in fact intend to authorize the Service to designate unoccupied land as “critical habitat” even if it had no “physical or biological features ... es- ' sential to the conservation of the species” but could be modified to become habitat, then it would not seem to be arbitrary or capricious for the Service to designate any particular parcel of land as critical habitat, even if there were other similar lands. The intent of Congress would be that land can be designated if the survival of the species depends on creating habitat for it. If this were in fact the intent of Congress, it would not be reasonable to say that because there is an abundance of land that could be modified to save the species, none of it can be designated. But the .majority opinion is unwilling to construe the Act in such a manner, because, as the opinion explains, Congress used the word “essential” as a meaningful limit on the authority of the Service to designate “critical habitat.” The opinion reasons, “[i]f the fields [that could be modified] are fungible, it would be arbitrary for the Service to label any single one ‘essential’ to the conservation of the species.”[59] Acknowledging that land lacking any features necessary for habitat cannot be “essential” to the conservation of the species, the opinion finds it necessary to construct a tortured interpretation of the Act to affirm what the Service has done in this case. That interpretation is as follows: land with no physical or biological features essential to the conservation of the species that is not occupied by the species but could be modified to become habitable can be deemed “essential” and designated as critical habitat, but only if there are virtually no other tracts similar to it, or land that is uninhabitable by the species but that has at least one physical or biological feature can be designated as critical habitat if the land can be modified to create all the other physical or biological features necessary to transform it into habitat for the species. I do not think that the word “essential” can bear the weight that the majority opinion places upon it in arriving at its interpretation of the Act.
The majority opinion strenuously denies that its holding allows the Service to “designate any land as critical habitat whenever it contains a single one of the ‘physical or biological features’ essential to the conservation of the species at issue.”[60] But the opinion’s ensuing explanation illustrates that is precisely the import of its holding: “if the ponds are essential, then Unit 1, which contains the ponds, is essential for the conservation of the dusky gopher frog.”[61] The Service itself found, based on scientific data, that the ponds are only one of three “primary constituent elements” that are “essential to the conservation of the species.”[62] The other two primary constituent elements are not present on Unit 1 and would require substantial modification of Unit 1 to create them.[63]
The Service’s construction of the Endangered Species Act is not entitled to any deference because it goes beyond what the meaning of “essential” can encompass. The Service’s construction of the Act is imper *491 missible, and the Service exceeded its statutory authority.
Ill
The majority opinion quotes a Supreme Court decision, which says: “[w]hen examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.”[64] However, the panel’s majority opinion does not identify any finding by the Service as being “this kind of scientific determination.” Instead, the opinion appears to address the proper interpretation of “essential for the conservation of the species,” as applied to the point of contention in this case, as a question of law based on the words Congress chose.
The fact that scientific evidence was a part of the proceedings leading to the Final Rule[65] does not mean that all determinations in the Final Rule are subject to deference by a reviewing court. No one disputes that reputable scientists made valid determinations in the administrative proceedings undertaken by the Service. However, the scientific evidence and conclusions have no bearing on the issue of statutory construction about which the parties in this case disagree: Did Congress intend to permit the designation of land as “critical habitat” when the land is not occupied by an endangered species and would have to be substantially modified then periodically maintained in order to be used as habitat, and when there is no indication that the land will in fact be modified or maintained in such a manner?
IV
The phrase “essential for the conservation of the species” requires more than a theoretical possibility that an area designated as “critical habitat” will be transformed such that its physical characteristics are essential to the conservation of the species. There is no evidence that it is probable that Unit 1 will be physically modified in the manner that the scientists uniformly agree would be necessary to sustain a dusky gopher frog population. The conclusion by the Service that Unit 1 is “essential for the conservation of the species” is therefore not supported by substantial evidence, and the designation of Unit 1 as “critical habitat” should be vacated under the APA.
The Service recognized in the Final Rule that under the Endangered Species Act and regulations implementing it, the Service is “required to identify the physical or biological features essential to the conservation of the dusky gopher frog in areas occupied at the time of listing, focusing on the features’ primary constituent elements.”[66] The Service explained that “[w]e consider primary constituent elements to be the elements of physical or biological features that, when laid out in the appropriate quantity and spatial arrangement to provide for a species’ life-history processes, are essential to the conservation of the species.”[67] The Service identified three primary constituent elements, briefly summarized as ephemeral wetland habitat with an open canopy (with certain specific characteristics), upland forested nonbreeding habitat dominated by longleaf pine main *492 tained by fires frequent enough to support an open canopy and abundant herbaceous ground cover, and upland habitat between breeding and nonbreeding habitat that is characterized by an open canopy, abundant native herbaceous species, and a subsurface structure that provides shelter for dusky gopher frogs during seasonal movements.[68]
The other eleven units designated in the Final Rule had all three constituent elements.[69] However, the Service found that Unit 1 has only one of the three primary constituent elements detailed in the Final Rule — the ephemeral ponds.[70] Isolated wetlands, like the ephemeral ponds that exist on Unit 1, are necessary to sustain a population of the species as a breeding ground.[71] But frogs do not spend most of their lives breeding in ponds, and the existence of the ponds will not alone provide the necessary habitat. “Both forested uplands and isolated wetlands ... are needed to provide space for individual and population growth and for normal behavior.”[72] The Service found that dusky gopher frogs “spend most of their lives underground in forested habitat consisting of fire-maintained, open-canopied, pine woodlands historically dominated by longleaf pine.”[73] Unit 1 is covered with a closed-canopy forest of loblolly pines.
The Service also identified the alterations and special management that would be required within the areas designated as critical habit, including Unit 1, to sustain a dusky gopher frog population.[74] The Service found with regard to Unit 1 that “[although the uplands associated with the ponds do not currently contain the essential physical or biological features of critical habitat, we believe them to be restora-ble with reasonable effort.”[75] This finding is insufficient to sustain the conclusion that Unit 1 is “essential for the conservation of the species” for at least two reasons. First, finding that the uplands are “restorable” is not a finding that the areas will be “restored.” Unless the uplands are restored, they cannot be and are not essential for the conservation of the frog. Second, the Service does not explain who will expend the “reasonable effort” necessary to restore the uplands. In sum, the designation of Unit 1 as critical habitat is not supported by substantial evidence because there is no evidence that Unit 1 will be modified in such a way that it can serve as habitat for the frog.
*493 In fact, the Service itself concluded that it is entirely speculative as to whether Unit 1 will be transformed from its current use for commercial timber operations into dusky gopher frog habitat by removing the loblolly pines and replacing them with longleaf pines, and by the other activities necessary to create frog habitat. The Service was required by the Endangered Species Act to assess the economic impact of designating critical habitat.[76] The Service recognized that as to Unit 1, the economic impact depended on the extent to which it might be developed,[77] and accordingly, whether section 7 consultation would be required because of a federal nexus.[78] Section 7 consultation would provide at least some potential that the owners of the land would be required to take measures to create habitat for the dusky gopher frog in order to obtain federal permits that would allow development. But the Service specifically found that “considerable uncertainty exists regarding the likelihood of a Federal nexus for development activities” on Unit l,[79] and that only the “potential exists for the Service to recommend conservation measures if consultation were to occur.”[80] This does not constitute substantial, or even any, evidence that Unit 1 is now or will become suitable habitat for the dusky gopher frog, which is the only basis on which the Service has ever posited that Unit 1 is “essential for the conservation of the species.”[81] (As discussed above, the Service has never contended that Unit 1 is essential because of support that it provides to another area that is occupied by the frog.)
The Service described three different scenarios to assess the potential economic impact of the Final Rule.[82] In the first scenario, “no conservation measures are implemented for the species.”[83] The Service reasoned that development on Unit 1 might avoid any federal nexus and therefore no consultation would be required, and no conservation of the species would occur. The Service therefore expressly recognized that Unit 1 may never play any role in the “conservation of the species.”
In the Service’s second scenario, the Service assumes that development is sought by the owners,[84] section 7 consultation occurs that results in development on *494 40% of Unit 1, and the remaining 60% is managed as dusky gopher frog habitat.[85] (The Service estimates that the landowners would suffer a loss of $20.4 million due to the loss of the option to develop 60% of the area.)[86] This is the only scenario, in the entirety of the Final Rule, that explains how, at least theoretically, Unit l’s landscape would be altered so that it could be used as dusky gopher frog habitat. But the Service made no findings that this scenario was likely or probable.
Under Scenario 3, the Service assumes that the owners desire to develop Unit 1, section 7 consultation occurs, but no development is permitted on Unit 1 by the Government “due to the importance of the unit in the conservation and recovery of the species.[87] (The Service estimates that the loss of the option to develop 100% of Unit 1 would result in a loss of $33.9 million to the owners.)[88] Significantly, the Service does not posit that any of Unit 1 would actually be used as dusky gopher frog habitat under Scenario 3, in spite of its alleged “importance” to conservation. Undoubtedly, that is because if the federal government would not permit the landowners to develop any part of Unit 1, why would the owners undertake to modify Unit 1 so that it could be used as frog habitat? The Government has no plans to pay for the creation of habitat on Unit 1. Habitat will only be created, and therefore conservation will only occur, if the owners decide to modify their property. The only evidence in the record is that the owners do not plan to do so and there is no evidence that the economic or other considerations would lead a reasonable landowner to create frog habitat on Unit 1.
Scenario 3 shows, in the starkest of terms, why the Service’s position that Unit 1 is “essential for the conservation of the species” is illogical on its face. Even if the Government does not allow any development on Unit 1 because of the existence of the ephemeral ponds, the Government is aware that Unit 1 cannot be used for the conservation of the dusky gopher frog because someone or some entity would have to significantly modify Unit 1 to make it suitable for frog habitat. Unsuitable habitat is not essential for the conservation of the species.
I would vacate the Final Rule’s designation of Unit 1 as critical habitat, and I therefore dissent.

. 16 U.S.C. § 1532(5)(A)(ii) (“The term 'critical habitat' for a threatened species means ... specific areas outside the geographical area occupied by the species at the time it is listed [as endangered], upon a determination by the Secretary that such areas are essential for the conservation of the species.’’).

. Id.

. Id. § 1531 et seq.

. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Dusty Gopher Frog, 77 Fed. Reg. 35,118 (June 12, 2012).

.16 U.S.C. § 1532(5)(A).

. 77 Fed. Reg. at 35,118.

. Id. at 35,118, 35,135.

. Id. at 35,135.

. Id. at 35,131.

. Id. at 35,133.

. Id. at 35,135.

. Id. at 35,123 (“Although we have no existing agreements with the private landowners of Unit 1 to manage this site to improve habitat for the dusky gopher frog, or to move the species there, we hope to work with the landowners to develop a strategy that will allow them to achieve their objectives for the property .... However, these tools and programs are voluntary, and actions such as habitat management through prescribed burning, or frog translocations to the site, cannot be implemented without the cooperation and permission of the landowner.”).

. Id. (noting "we hope to work with the landowners”).

. Id. at 35,129.

.- 5 U.S.C. §§ 702, 704, 706; see Bennett v. Spear, 520 U.S. 154, 171-75, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (holding that a claim of the Service's "maladministration of the ESA” is not reviewable under 16 U.S.C. § 1540(g)(1)(A) or (C) (citizen-suit provisions of the ESA) but is reviewable under the APA); 5 U.S.C. § 702 (“A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.”).

. 5 U.S.C. § 706(2)(A), (C).

. 16 U.S.C. 1532(5)(A)(ii).

. Endangered and Threatened Wildlife and Plants: Designation of Critical Habitat for Dusty Gopher Frog, 77 Fed. Reg. 35,118, 35,-123 (June 12, 2012).

. Black’s Law Dictionary (10th ed. 2014) (emphasis in original).

. Bear Valley Mut. Water Co. v. Jewell, 790 F.3d 977, 994 (9th Cir. 2015).

. Ante at 467-68.

. Bear Valley, 790 F.3d at 994.

. 16 U.S.C. § 1532(5)(A)(ii).

. MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (citing Pittston Coal Grp. v. Seb-ben, 488 U.S. 105, 113, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988)).

. Id. at 220, 114 S.Ct. 2223.

. Id. at 224, 114 S.Ct. 2223 (quoting 47 U.S.C. § 203(b)(2)).

. Id. at 220, 114 S.Ct. 2223.

. Id. at 228, 114 S.Ct. 2223.

. Id. at 229-31, 114 S.Ct. 2223.

. Id. at 231, 114 S.Ct. 2223.

. Id. at 231-32, 114 S.Ct. 2223.

. 43 F.3d 1515, 1521 (D.C. Cir. 1995).

. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

. Sw. Bell Corp., 43 F.3d at 1521 (quoting Nat’l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992)).

. Id.

. Id.; see also id. (“Section 203(a) requires the filing of ‘schedules showing all charges,’ which clearly suggests something more definite and specific than rate ranges.”).

. Ante at 467-68 n. 15 (alteration in original) (quoting MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)).

. Id.

. 16 U.S.C. § 1532(5)(A)(ii).

. Ante at 469'.

. Id; see also id. ("And the Landowners do not explain why it is impossible to make an essentiality determination without determining when (or whether) the conservation goal will be achieved.”).

. See ante at 469.

. Id.

. See ante at 470 n. 17; 471 n. 18.

. Ante at 470-71 ("Here, the Service confirmed through peer review and two rounds of notice and comment a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature — the ephemeral *488 ponds — which justified its finding that Unit 1 was essential for the conservation of the dusky gopher frog.”).

. Ante at 471.

. Ante at 472.

. 16U.S.C. § 1533(b)(2).

. Id. § 1532(5)(A)(i).

. Ante at 471-72 n. 19 ("Even assuming that [the best scientific data available would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species], it does not follow that scientists or the Service would or could then reasonably call an empty field essential for the conservation of a species.”).

. Ante at 470-71.

. Ante at 468 (alteration in original) (quoting Markle Interests, LLC v. U.S. Fish & Wildlife Serv., 40 F.Supp.3d 744, 761 (E.D. La. 2014)).

. 16U.S.C. § 1532(5)(A)(ii).

. See also ante at 468.

. See also id. (“[T]he plain text of the ESA does not require Unit 1 to be habitable.”).

. See ante at 471-72 n. 19.

. Id.

. Id. (citation omitted).

. Id.

. Ante at 472 n. 20 (quoting 16 U.S.C. § 1532(5)(A)(i)).

. Id.

. See Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Dusty Gopher Frog, 77 Fed. Reg. 35,118, 35,-131 (June 12, 2012).

. Id. (acknowledging that Unit 1 contains only one of the primary constituent elements necessary to sustain a dusky gopher frog population).

. Ante at 464-65 (quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

. See 16 U.S.C. § 1533(b)(2) ("The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available ....”).

. 77 Fed. Reg. at 35,131.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id. at 35,129.

. Id.) see also id. at 35,130 ("Both adult and juvenile dusky gopher frogs spend most of their lives underground in forested uplands.”)

. Id. at 35,131-32. The Service concluded:
Special management considerations or protection are required within critical habitat areas to address the threats identified above. Management activities that could ameliorate these threats include (but are not limited to): (1) Maintaining critical habitat areas as forested pine habitat (preferably longleaf pine); (2) conducting forestry management using prescribed burning, avoiding the use of beds when planting trees, and reducing planting densities to create or maintain an open canopied forest with abundant herbaceous ground cover; (3) maintaining forest underground structure such as gopher tortoise burrows, small mammal burrows, and stump holes; (4) and protecting ephemeral wetland breeding sites from chemical and physical changes to the site that could occur by presence or construction of ditches or roads. Id. at 35,132.

.Id. at 35,135.

. Id. at 35,140.

. Id.

. Id.

. Id.

. Id. (emphasis added).

. 16U.S.C. § 1532(5)(A)(ii).

. 77 Fed. Reg. at 35,140-41.

. Id. at 35,140 (emphasis added). The Service explained:
Under scenario 1, development occurring in Unit 1 avoids impacts to jurisdictional wetlands and as such, there is no Federal nexus (no Federal permit is required) triggering section 7 consultation regarding dusky gopher frog critical habitat. Absent consultation, no conservation measures are implemented for the species, and critical habitat designation of Unit 1 does not result in any incremental economic impact.

Id.

.Id. at 35,140-41:
According to scenarios 2 and 3, the vast majority of the incremental impacts would stem from the lost development value of land in Unit 1. Under scenarios 2 and 3, less than one percent of the incremental impacts stem from the administrative costs of future section 7 consultations. Under scenario 2, the analysis assumes the proposed development of Unit 1 requires a Section 404 permit from the Corps due to the presence of jurisdictional wetlands. The development would therefore be subject to section 7 consultation considering critical habitat for the dusky gopher frog. This scenario further assumes that the Service works with the landowner to establish conservation areas for the dusky gopher frog within the unit. The Service anticipates that approximately 40 percent of the unit may be devel *494 oped and 60 percent is managed for dusky gopher frog conservation and recovery. According to this scenario, present value incremental impacts of critical habitat designation due to the lost option for developing 60 percent of Unit 1 lands are $20.4 million. Total present value incremental impacts of critical habitat designation across all units are therefore $20.5 million ($1.93 million in annualized impacts), applying a 7 percent discount rate.
Scenario 3 again assumes that the proposed development of Unit 1 requires a Section 404 permit and therefore is subject to section 7 consultation. This scenario further assumes that, due to the importance of the unit in the conservation and recovery of the species, the Service recommends that no development occur within the unit. According to this scenario, present value impacts of the lost option for development in 100 percent of the unit are $33.9 million. Total present value incremental impacts of critical habitat designation across all units are therefore $34.0 million ($3.21 million in annualized impacts), applying a 7 percent discount rate.

. See id.

. Id. at 35,141.

. Id.

. Id.